Michiko Stehrenberger, *listed creditor*
2500 Blanchard Road
Santa Rosa Valley, CA 93012
document.request@gmail.com
(*email service preferred*)
(206) 229-4415


IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF IDAHO, BOISE DIVISION

---

| | |
|---|---|
| MICHIKO STEHRENBERGER,<br>Plaintiff,<br><br>v.<br><br>TAMIO LUCIEN STEHRENBERGER,<br>ANNA CHRISTINE STEHRENBERGER,<br>Debtors/Defendants,<br><br>STAR MOUNTAIN ENTERPRISES, LLC,<br>an expired Utah entity managed by debtors,<br>Defendant,<br><br>JOHN DOES 1-100,<br>Defendants. | Adversary case no. 20-06044-NGH<br>Chapter 7 case no. 20-00833-NGH<br><br>PLAINTIFF'S AMENDED<br>ADVERSARY COMPLAINT<br><br>(REQUEST FOR DETERMINATION<br>OF EXCEPTIONS TO DISCHARGE<br>UNDER 11 U.S.C. § 523(a),<br>DECLARATORY JUDGMENT, AND<br>OTHER RELIEF) |

---

Plaintiff Michiko Stehrenberger, hereby respectfully requests this Court's determination

that each of her claims as filed in District of Idaho bankruptcy case 20-00833-NGH are excepted

from discharge, as appropriate under 11 U.S.C. § 523(a)(2)(A) and (B); (4); (6); and (19)(A)(i)

and (ii) and (B)(i) and Bankruptcy Rule 4007(c), and for declaratory judgment under 28 U.S.C. §

2201 and Rules 7001(2) and 7001(9); and for the other relief requested herein, under relevant

authority. Fed. R. Civ. P. 9(b)'s heightened pleading standard (regrettably) necessitates the length

and level of detail of the allegations included within this *Amended Complaint.*

## JURISDICTION AND VENUE

1.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.

2.  This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(1).

3.  Venue in the U.S. Bankruptcy Court for the District of Idaho, Boise Division, is proper under 28 U.S.C. § 1409, as the co-debtors' Chapter 7 bankruptcy case, *In re Tamio Lucien Stehrenberger and Anna Christine Stehrenberger*, case no. 20-00833-NGH, is also pending before this Court.

4.  Determination of exceptions to the co-debtors' discharge of certain debts is appropriate under 11 U.S.C. § 523(a) and its subsections (a)(2)(A), (a)(2)(B), (4), (6), (19)(A)(i) and (ii), and (B)(i), and the 90-day extension of the filing deadline under Fed. R. Bankr. P. 4007(c) granted by this Court on December 21, 2020, and leave to amend until March 15, 2021 as granted by this Court's February 22-24, 2021 order.

5.  Declaratory judgment is appropriate under 28 U.S.C. § 2201, Fed. R. Bankr. P. 7001(2), 7001(9), and Fed. R. Civ. P. 57.

6.  This Court has authority to hear this adversary proceeding, and under *Grogan v. Garne*r, 498 U.S. 2799, 284 n. 11 (1991), this Court retains exclusive jurisdiction to determine whether a debt is dischargeable. Such claims statutorily constitute core proceedings as contemplated by 28 U.S.C. 157(b)(2)((I) and (O), and meet all constitutional standards for the proper exercise of full judicial power by this Court.

## THE PARTIES

7.  Plaintiff Michiko Stehrenberger ("Michiko") is a creditor in this case, and her three Proofs of Claims were entered February 25-26, 2021 as claim numbers 24-26 in the claims docket in the related bankruptcy case number 20-00833-NGH.

8.  Defendant Tamio Lucien Stehrenberger, one of the debtors in bankruptcy case number 20-00833-NGH, is the younger brother of Plaintiff Michiko, and is or was a Managing Member, Manager, Member, President, officer, principal, or other control person of Star Mountain Enterprises, LLC, and also is or was the General Partner of the Taanen, LP partnership during the time periods relevant to this action.

9.  Defendant Anna Christine Stehrenberger, the other debtor in bankruptcy case number. 20-00833-NGH, is the wife of Tamio Lucien Stehrenberger, and is or was a Managing Member, Manager, Member, Vice-President, officer, principal, or other control person of Star Mountain Enterprises, LLC, and also is or was a limited partner of the Taanen, LP partnership during the time periods relevant to this action.

10. The marital community of debtors Tamio Stehrenberger and Anna Stehrenberger is comprised of both of their interests and community property together.

11. Defendant Star Mountain Enterprises, LLC is an expired Utah entity, Utah Department of Corporations entity number 6215366-0160, organized and registered with the State of Utah on May 15, 2006 nature . Defendants Tamio and Anna caused Star Mountain to file its Chapter 7 petition in the District of Utah on June 2, 2019 (case no. 19-24015-RKM). On November 13, 2020, the District of Utah closed Star Mountain's Chapter 7 case, none of Star Mountain's debts were discharged, and the automatic stay was lifted in that case.

12. John Doe Defendants 1-100, parties whose identities are not yet known at this time, have transferred assets or property to, or from, the Defendants and/or their various family members, friends, or shell entities, or are parties who otherwise have an interest, claim, or an involvement in the property or information related to the bankruptcy case, the bankruptcy estate, and/or this action.

13. Non-party Taanen, LP is one of the debtors' other expired shell entities. Defendants

Tamio and Anna caused Taanen to file its Chapter 7 petition in the District of Utah on

June 2, 2019 (District of Utah case no. 19-24016-RKM) alongside that of Star

Mountain's. Plaintiff Michiko is the only creditor to have filed any Proof of Claim in

Taanen's case, and the Taanen estate's Chapter 7 Trustee, Mr. Philip G. Jones, filed a

Proof of Claim for the "fraudulent transfer of company assets of Taanen, LP to Tamio" in

the amount of $25,917.15, which is claim number 5 in the claims index in this case.

RELEVANT PROVISIONS OF 11 U.S.C. § 523(a)

Under 11 U.S.C. § 523(a), governing exceptions to discharge:

> A discharge under section 727, 1141, 1192 [1] 1228(a), 1228(b), or
> 1328(b) of this title does not discharge an individual debtor from any debt
>
> (2) for money, property, services, or an extension, renewal, or refinancing
> of credit, to the extent obtained by— **(A) false pretenses, a false
> representation, or actual fraud, other than a statement respecting the
> debtor's or an insider's financial condition;** (**B) use of a statement in
> writing-- (i)   that is materially false; (ii)   respecting the debtor's or
> an insider's financial condition; (iii)   on which the creditor to whom
> the debtor is liable for such money, property, services, or credit
> reasonably relied;   and (iv)   that the debtor caused to be made or
> published with intent to deceive;** [...]
>
> (4) for fraud or defalcation while acting in a fiduciary capacity,
> embezzlement, or larceny;
>
> (6) for willful and malicious injury by the debtor to another entity or to
> the property of another entity; [ . . . ]
>
> (19) that— (A) is for—
>
> (i) **the violation** of any of the Federal securities laws (as that term is
> defined in section 3(a)(47) of the Securities Exchange Act of 1934), any **of
> the State securities laws**, or any regulation or order issued under such
> Federal or State securities laws; **or**
>
> (ii) **common law fraud, deceit, or manipulation in connection with the**

**purchase or sale of any security**; **and**

(B) **results, before**, on, or after **the date on which the petition was filed, from**—

(i) a**ny judgment, order,** consent order, or decree **entered in any Federal or State judicial or administrative proceeding**;  (emphasis added)

## ALLEGATIONS

1. Defendants are precluded from re-litigating the Utah state court's declaration of their joint and several liability for having committed securities fraud and violating the Utah Uniform Securities Act, and the state court's award of statutory and treble damages in favor of Plaintiff Michiko Stehrenberger related to the state court's August 24, 2017 final order, findings, and conclusions, Ex. 1 at ¶¶ 3,6-7.

> [T]he Court hereby declares that defendant[] Star Mountain Enterprises, LLC [has] violated the Utah Uniform Securities Act, Utah Code § 61-1-1, *et seq*., including the Utah Securities Act's "anti-fraud" provision pertaining to Defendant [] Star Mountain Enterprises, LLC's omission of material facts made in connection with the sale of the securities in this case, in the manner of failing to disclose the "high-risk" warnings of the Landmark Venture Capital, LLC investment offering in connection with the sale of the Star Mountain-issued promissory notes [filed along with Plaintiff's August 15, 2016 Amended Complaint in that case as Ex. 4-8].

>  [T]he Court concludes that Defendants Tamio Stehrenberger and Anna Stehrenberger are specifically identified by name as the two Managers of Star Mountain Enterprises, LLC during the time period relevant to this case []

> [T]he two Managers of Star Mountain Enterprises, LLC are persons who are jointly and severally liable together with Defendant Star Mountain Enterprises, LLC for the Utah Securities Act violations committed and the money owed.

2. In its August 24, 2017 order, the Utah state court also awarded Plaintiff Michiko treble damages, interest, fees, and costs under the Utah Securities Act's statutory damages formula (Utah Code Ann. § 61-1-22(1) and (2)).

3.  The Utah state court stated in its order at ¶ 9 that the final dollar amount of damages
    would be determined by separate proceedings under Utah R. Civ. P. 55(b)(2).

4.  On June 2, 2019, Defendants caused Star Mountain Enterprises, LLC to file a Chapter 7
    petition in the District of Utah two days before the Utah state court's June 4, 2019 hearing
    to determine damages.

5.  Plaintiff filed her Proof of Claim in this case as claim number 25, applying the Utah
    Securities Act's statutory damages formula under Utah Code Ann. § 61-1-22(1) and (2)
    to derive the claim amount of $2,155,348.26 accrued as of the debtors' September 11,
    2020 petition date in the related bankruptcy case, number 20-00833-NGH.

6.  The Utah state court designated its August 24, 2017 order, findings, and conclusions as a
    final order under Utah R. Civ. P. 54(b). Ex. 1 at ¶¶ 5 and 11.

7.  The Utah state court noted that the defaulted entities, Star Mountain Enterprises and
    Taanen, LP are creatures of fiction, and could only have acted through natural persons; in
    this case through Star Mountain's Managers/Members, which on various public records
    and court filings are Defendants Tamio and Anna.

8.  The Utah state court denied Defendants' motions to set aside the defaults of Star
    Mountain Enterprises, LLC and declined to reverse its declaration of joint and several
    liability against the Managers of Star Mountain Enterprises, LLC.

9.  On October 3, 2017, Defendants through their counsel ratified the defaults of Star
    Mountain Enterprises, LLC in their proposed order, which the state court entered
    verbatim.

10. None of the Defendants appealed the Utah state court's declaration of joint and several
    liability for securities fraud and violations of the State Securities Act or the court's award

of statutory damages, including the award treble damages, interest, fees, and costs, to

Plaintiff Michiko.

**COUNT ONE:**
**Excepting from discharge debts arising from securities fraud and**
**violations of the Utah Securities Act under 11 U.S.C. § 523(a)(19)(A)(i),(B)(i)**
**(as based upon the Utah state court's August 24, 2017 final order)**

11. Plaintiff re-alleges and incorporates by reference all other facts, allegations and exhibits

    set forth in this and the other sections of this *Amended Complaint.*

12. "Issue preclusion–sometimes referred to as collateral estoppel–is a viable tool in § 523

    litigation. In determining the preclusive effect of a state court judgment in a subsequent

    federal suit (including dischargeability proceedings), the court looks to the issue-

    preclusion law of the state that rendered the judgment." *Gayden v. Nourbakhsh (In re*

    *Nourbakhsh*), 67 F.3d 798, 800 (9th Cir. 1995).

13. "The full faith and credit statute 'directs a federal court to refer to the preclusion law of

    the State in which the judgment was rendered.'" *Marrese v. American Academy of*

    *Orthopaedic Surgeons,* 470 U.S. 373, 380-82, 105 S. Ct. 1327, 1332, 84 L. Ed. 2D 274

    (1985).

14. Applying Utah law to the Utah state court's order, default judgments are final for the

    purposes of precluding the debtors from re-litigating the issues of their liability or the

    court's award of damages. Under *In re Armstrong*, 294 B.R. 344, 357 (B.A.P. 10th Cir.

    2003)

>       In this Circuit, default judgments also have preclusive effect. *McCart v.*
>       *Jordana (In re Jordana),* 232 B.R. 469, 477 (10th Cir. BAP 1999) (finding
>       "a default judgment entered against a defendant for abuse of the discovery
>       process has preclusive effect in subsequent litigation."); *accord Wolstein v.*
>       *Docteroff (In re Docteroff),* 133 F.3d 210 (3d Cir.1997); *Pahlavi v. Ansari*
>       *(In re Ansari),* 113 F.3d 17 (4th Cir.1997); *Gober v. Terra + Corp. (In re*

*Gober),* 100 F.3d 1195 (5th Cir.1996); *Bush v. Balfour Beatty Bahamas, Ltd. (In re Bush),* 62 F.3d 1319 (11th Cir.1995); *FDIC v. Daily (In re Daily),* 47 F.3d 365 (9th Cir.1995).

15. As explained in *Armstrong,* 294 B..R. at 357:

> The bankruptcy court carefully went through each element of the Utah collateral estoppel doctrine and determined that the Utah Default Ruling prohibited the bankruptcy court from reconsidering any issues about liability that had already been raised in the Utah federal court.
>
> **Armstrong argues that the Utah Default Ruling is not final because there was no written ruling entered and therefore, it is not entitled to preclusive effect. Case law provides otherwise. As cited by the bankruptcy court in its ruling, the law provides that a ruling of a court, even when the ruling is a default judgment, is sufficiently final for purposes of preclusion**. *Jordana,* 232 B.R. at 477. **The fact that a ruling has not been memorialized in writing does not defeat the doctrine of collateral estoppel**. (referencing *Wolstein v. Docteroff (In re Docteroff),* 133 F.3d 210, 216 (3d Cir.1997, finding that "[b]y filing a Chapter 11 bankruptcy petition and invoking the automatic stay [the debtor] prevented the district court from holding a trial on damages and entering final judgment [, and] **[p]ermitting [the debtor] to re-litigate the issue in light of his original rejection of a full and fair opportunity to litigate would implicitly endorse his abuse of the judicial process**.").

16. The *Rooker-Feldman* doctrine prohibits federal courts from reviewing or changing a state court judgment. *Armstrong,* 294 B.R. at 357.

17. "In Utah, collateral estoppel will bar the litigation of a claim when the following four elements are met:

> (1) the issue previously decided is identical with the one presented in the action in question,
>
> (2) the prior action has been finally adjudicated on the merits,
>
> (3) the party against whom the doctrine is invoked was a party [to] or in privity with a party to the prior adjudication, and
>
> (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action."

> *Frandsen v. Westinghouse Corp.,* 46 F.3d 975, 978 (10th Cir.1995) (quoting
>
> *Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation,* 975 F.2d 683,
>
> 687 n. 5 (10th Cir.1992)).

18. "Utah collateral estoppel requirements are "substantially the same as under federal law."'
    *Frandsen,* 46 F.3d at 978.

19. The Utah state court's August 27, 2017 final order further states that "Plaintiff Michiko
    Stehrenberger shall be entitled to further damages, fee[s], cost and any other appropriate
    relief related to any appeal or enforcement and collection of this Judgment, as permitted
    by law or contract."

20. The terms of the underlying Star Mountain-issued promissory notes additionally
    authorize Plaintiff to recover her fees and costs related to this bankruptcy proceeding and
    post-bankruptcy enforcement.

21. Under *Bartenwerfer v. Buckley* (*In re Bartenwerfer*), 613 B.R. 730 (9th Cir. BAP Apr. 23,
    2020), the attorney fees and costs for determining the non-dischargeability of this debt
    are themselves non-dischargeable under the decision, and Plaintiff requests the additional
    relief of pre-judgment interest, attorneys, fees, costs, and expenses in litigating this
    dischargeability matter.

22. Additionally, 11 U.S.C. § 523(a)(2)(A) excepts from discharge any other attorneys' fees
    that are traceable to the fraud. *Cohen v. De La Cruz,* 523 U.S. 213, 218-19 & 223 (1998).

### COUNT TWO: Declaratory Relief
### Joint and several liability (vicarious liability, entity-piercing, and alter ego)

23. Plaintiff re-alleges and incorporates by reference all other facts, allegations and exhibits
    set forth in this and the other sections of this *Amended Complaint.*

24. To the extent the Court may somehow not consider the Utah state court's August 24, 2017 final order to be sufficient under the decisions *Grogan*, *Armstrong*, and others to preclude the debtors from being able to re-litigate the issues of their liability and damages, a justiciable controversy exists because the Defendants assert that they should not be held jointly and severally liable together with Star Mountain Enterprises, LLC.

25. Defendants Tamio and Anna admit in their September 28, 2016 *Amended Answer* at ¶ 288 in Utah state case 16010092 that Utah's Securities Act, Utah Code Ann. § 61-1-1 provides that:

> It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly to:
>
> (1) Employ any device, scheme, or artifice to defraud; (2) Make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (3) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

26. Under the Utah Securities Act's entity-piercing and alter ego provision, Utah Code Ann. § 61-1-22(4)(a), Defendants Tamio and Anna are jointly and severally liable in their roles as the Managers, Managing Member, Member, officer, President, Vice President (a matter of strict liability for control persons of the entity), and additionally liable for having "materially aided in the sale" of the Star Mountain-issued promissory note securities.

27. Utah Code Ann. § 61-1-22(4)(a) governs:

> Every person who directly or indirectly controls a seller or buyer liable under Subsection (1), every partner, officer, or director of such a seller or buyer, every person occupying a similar status or performing similar functions, every employee of such a seller or buyer who materially aids in the sale or purchase, and every broker-dealer or agent who materially aids in the sale or purchase are also liable jointly and severally with and to the same extent as the seller or purchaser, unless the non-seller or non-

purchaser who is so liable sustains the burden of proof that the non-seller or non-purchaser did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

28. The elements of proof for the two prongs of joint and several liability are disjunctive, but both prongs are met through the facts of this case, as Defendants Tamio and Anna are both functioned as control persons of Star Mountain Enterprises, LLC in selling the Star Mountain-issued promissory notes to Plaintiff Michiko and other investors Francine Yeh and Ken Hsieh, and both Defendants Tamio and Anna have already admitted in their January 29, 2011 Memorandum filed into Utah state court case 080402986 that they each "played an active roles in selling the securities":

> Tamio Stehrenberger was a manager of Star Mountain [Enterprises] during the time it sold securities to Michiko, and he played an active role in selling the securities to Michiko.

> Anna Stehrenberger was a manager of Star Mountain [Enterprises] during the time it sold securities to Michiko, and he played an active role in selling the securities to Michiko.

29. If the Court requires the parties to re-litigate the issues of liability and damages previously addressed in the Utah state court's August 24, 2017 final order, then the following facts support the Court's finding of the same liability and awarding of the statutory damages under the Utah Securities Act:

30. Defendant Star Mountain Enterprises, LLC had only two individuals as its Members, Defendants Tamio (listed in public records and court records as Manager and as Managing Member) and Anna (listed in public records and court records as Manager and as Member), and Star Mountain was controlled exclusively by these two individuals during its existence as an entity.

31. There was such a unity of interest and control between Defendant Star Mountain Enterprises, LLC and its members Defendants Tamio and Anna that they cannot really be said to have been separate entities, based in part upon the following:

32. Defendant Tamio identified himself as the "President" of Star Mountain Enterprises in his day-to-day activities during that time period, such as when raising money from new investors,  interacting with existing investors, executing contracts and promissory notes, opening financial accounts, and making payments on behalf of Star Mountain.

33. Defendant Anna identified herself as the "Vice President" of Star Mountain in her day-to-day activities during that time period, such as when raising money from new investors, interacting with existing investors, writing checks, initiating electronic payments, handling investor requests for "verification of deposit" and other activities on behalf of Star Mountain.

34. Tamio Stehrenberger is the Managing Member of Star Mountain Enterprises, LLC, as declared by him on June 1, 2019 under penalty of perjury in District of Utah bankruptcy case no. 19-24015, *In re Star Mountain Enterprises, LLC*. Ex. 2, excerpt from Star Mountain's Chapter 7 petition.

35. Tamio Stehrenberger and Anna Stehrenberger were both identified as the two Managers of Star Mountain Enterprises, LLC on the Utah Department of Commerce's Registered Principal Search public records results. Ex. 2.

36. Tamio Stehrenberger and Anna Stehrenberger were both identified as the two Managers of Star Mountain Enterprises, LLC in Star Mountain's *Articles of Organization* dated May 15, 2008. Ex. 2.

37. Based upon the record facts, Defendants Tamio and Anna are the "Managers/Members"

of Star Mountain Enterprises, LLC, and the Court may declare them the parties that the

Utah state court intended as the jointly and severally liable parties to pierce the entity veil

and determine the Defendants Tamio, Anna, and Star Mountain Enterprises, LLC as alter

egos of one another for the purposes of determining their liability and awarding statutory

damages under the Utah Securities Act.

**COUNT THREE:**
**Exception from discharge under 11 U.S.C. § 523(a)(19)(A)(i)-(ii)**
**(fraud in connection with purchase or sale of securities; violations of a State securities act)**

38. Plaintiff re-alleges and incorporates by reference all other facts, allegations and exhibits

set forth in this and the other sections of this *Amended Complaint.*

A. Violations of the "anti-fraud" provision (Utah Code Ann. § 61-1-1(2))

39. TheUtah state court securities fraud action and related claims arose under the Utah

Uniform Securities Act, Utah Code Ann. § 61-1-1, *et seq.*, and the laws of the State of

Utah govern.

40. The five Star Mountain-issued promissory notes that are the subject of the Utah state

court action each state in their terms that the laws of the State of Utah are the governing

law. Ex. 3.

41. Under the Utah Securities Act, Utah Code Ann. § 61-1-22(1) and (2), the remedy is set

forth in a statutory damages formula, for which the Court may award treble damages if

the violations are determined to have been done "intentionally or recklessly."

42. Under *S&F Supply Co. v. Hunter*, 527 P.2d 217, 220-21 (Utah 1974):

> The purpose of this statutory imposition [of Utah Code Ann. § 61-1-22(1)
> (b)] of civil liability on defrauding sellers [of securities] "was to moderate
> the requirements of common law fraud, and the difficulties involved in its
> proof, by imposing a higher standard of ethics and responsibility upon the
> sellers of securities in placing upon them the affirmative duty of making

full disclosure of all material facts."

43. Tamio and Anna admitted in the *Amended Answer* at ¶ 5 in the Utah state case that "in 2005, Defendants Tamio and Anna attended investment training seminars affiliated with Claud Rick Koerber ("Koerber") and his investment companies Franklin Squires and Founders Capital.

44. In or about June-July of 2005, Koerber was operating Founders Capital and its related entity or network, FranklinSquires.

45. In or about June-July of 2005, Defendants Tamio and/or Anna told Michiko that they were part of an private investors' network related to raising money to invest in Franklin Squires and/or Founders Capital.

46. In or about this June-July of 2005 time period, Defendants Tamio and/or Anna indicated that they regarded favorably Koerber and/or others within the Franklin Squires or Founders Capital social circle as mentors for Tamio's and Anna's investment education.

47. Koerber had been found liable by the Wyoming securities regulatory agency for violating securities laws.

48. In or about June-July of 2005, Defendant Tamio was aware that Koerber had been found liable of violating securities laws.

49. In or about June-July of 2005, Defendant Anna was aware that Koerber had been found liable of violating securities laws.

50. In or after 2017, Koerber has since been criminally prosecuted by the U.S. Department of Justice for running a Ponzi scheme or other widespread investment fraud, and Koerber is or was serving prison time for multiple counts of securities fraud.

51. In or about June-July of 2005, Tamio and/or Anna did not disclose to Michiko or the

other investors that Koerber had been found liable for violating securities laws.

52. Defendants Tamio and Anna formed Star Mountain Enterprises, LLC on or about May 15, 2006 to raise money from investors and place their money into private investments not publicly available or registered with the U.S. Securities and Exchange Commission.

53. Defendants Tamio and/or Anna approached Plaintiff Michiko to invest her savings with them beginning in July 2005.

54. Defendants Tamio and/or Anna utilized promissory notes with investors, promising to repay the investment on a monthly return plus repayment of all of the principal amount invested on the maturity date of the promissory note.

55. By April 23, 2007, Defendants Tamio and/or Anna had received $100,000.00 from Plaintiff Michiko in exchange for promissory notes issued by Defendants' company, Star Mountain Enterprises, LLC, related to the non-public investments they described to her.

56. Defendants Tamio and/or Anna also received investment money from Tamio's and Michiko's aunt, Francine Yeh, and uncle Ken Hsieh.

57. Plaintiff Michiko and her aunt Francine Yeh and uncle Ken Hsieh at the time were new investors with  very little experience, and so they relied on the investment advice offered to them by Defendants Tamio and Anna.

58. In connection with the sale of the Star Mountain-issued promissory note securities, Tamio and/or Anna represented to Plaintiff Michiko that the investments evidenced by the Star Mountain-issued promissory note securities were "safe."

59. In connection with the sale of the Star Mountain-issued promissory note securities, Tamio and/or Anna represented to Michiko that the investments evidenced by the Star Mountain-issued promissory note securities were "guaranteed."

60. In connection with the sale of the Star Mountain-issued promissory note securities, Tamio and/or Anna represented to Michiko that the investments evidenced by the Star Mountain-issued promissory note securities would be invested in investments collateralized by real property to help reduce the risk of loss to her investment.

61. In connection with the sale of the Star Mountain-issued promissory note securities, Tamio and/or Anna first represented to Michiko that her investment money would be invested with Founders Capital or Franklin Squires, but Tamio later asked Michiko's permission to move Michiko's investment into "McGuire Funds," (a/k/a McGuire Financial) with an individual named Les McGuire.

62. Defendant Tamio told Michiko by email that the "McGuire Funds" investment was "backed the same way," indicating that the McGuire Funds investment was also collateralized by real property to help reduce the risk of loss to her investment.

63. In connection with the sale of the Star Mountain-issued promissory note securities, Tamio and Anna failed to disclose to Michiko, Francine, and/or Ken that the investments evidenced by the Star Mountain-issued promissory notes were neither "safe" nor "guaranteed," and that the investment was instead switched into an entirely different company, Landmark Venture Capital, LLC and/or Bray-Conn, which had provided to Tamio and Anna written risk disclosures warning that the Landmark investment was instead "high-risk" and that there was a risk of total loss to the investors' money.

64. In Utah state court case 160100092, Tamio and Anna each admitted as true in their September 28, 2016 *Amended Answer* at ¶ 67 that:

> Tamio, Anna, and/or SME [Star Mountain Enterprises, LLC] considered investing in an investment offered by [defendant in the Utah state case] Landmark Venture Capital, LLC ('Landmark').

65. Defendants Tamio, Anna, and/or Star Mountain admitted in their May 3, 2010 discovery responses in Utah state court case 080402986 that they had switched Plaintiff's investment money out of the McGuire investment and into the Landmark investment in August 2006, Ex. 5, but this was done without Michiko's prior knowledge or permission.

66. Defendants Tamio, Anna, and/or Star Mountain again failed to disclose to Plaintiff Michiko that they had switched Michiko's prior investment with McGuire Funds instead into Landmark Venture Capital in August 2006 in connection with Defendants' sale of two Star Mountain-issued promissory notes in April of 2007, for which Star Mountain received a total investment of $100,000.00 from Michiko.

67. In or about August 2006, Landmark offered promissory notes to all of its investors, including Star Mountain Enterprises, LLC offering a 72% rate of return per year, to be paid at the rate of approximately 6% per month based upon the dollar amount of principal invested. Ex. 6, excerpt of the transcript from the deposition testimony of Mr. Cary Valerio as Managing Member of Landmark Venture Capital, LLC.

68. In Utah state court case 160100092, Defendants Tamio and Anna each admitted in their September 28, 2016 *Amended Answer* at ¶ 70-72, 88 that:

> In 2006 Tamio, Anna, and/or SME [Star Mountain Enterprises, LLC] received written risk disclosures from Landmark related to a new investment offering from Landmark and/or the Bray-Conn entities.

69. Defendants Tamio, Anna, and/or Star Mountain did not tell Plaintiff Michiko about the Landmark/Bray-Conn investment prior to putting Michiko's money into Landmark/Bray-Conn's custody or control.

70. Defendant Tamio first mentioned Landmark/Bray-Conn to Plaintiff Michiko years later,

in or about June-September 2008, and only months *after* Tamio had first indicated to Michiko that her $100,000.00 could not be repaid to her as they had agreed.

71. Plaintiff Michiko had no knowledge of the Landmark/Bray-Conn investment or its risks in 2006 or 2007, prior to Defendants Tamio, Anna, and/or Star Mountain risking her money in the Landmark/Bray-Conn investment.

72. Defendants have no evidence to support that Plaintiff Michiko had any knowledge that Defendants had switched Michiko's investment into Landmark/Bray-Conn instead of the "McGuire Funds" investment Tamio said was where Michiko's money was invested.

73. In Utah state court case 160100092, Tamio and Anna each admitted as true in their September 28, 2016 *Amended Answer* at ¶ 71 that:

> In these disclosures, Landmark identifies itself as 'high-risk."

74. In Utah state court case 160100092, Tamio and Anna each admitted as true in their September 28, 2016 *Amended Answer* at ¶ 72 that:

> Further, Landmark's disclosures indicate a risk of total loss to its investors' money.

75. Landmark's "Confidential Memorandum Regarding Debt Securities" ("Landmark's written risk disclosures") is applicable to the investments made by Defendants through money they obtained from Michiko, Francine, and Ken through the Star Mountain-issued promissory note securities.

76. In Utah state court case 080402986, Defendant Tamio admitted in response to Plaintiff's Requests for Admission no. 70, which Defendants caused to be filed into the public court record of that case:

> Tamio admits that Star Mountain received the...Confidential Private Placement Memorandum..with respect to Landmark Venture Capital, LLC.

77. Landmark's "Confidential Memorandum" (the written risk disclosures), <u>Ex. 4</u>,

prominently warn prospective investors of the risks of the investment:

> <u>Summary of the Offering. Risk Factors</u>: The Company [Landmark] Notes
> (referred to hereafter as "Investment") being offered hereby (hereafter, the
> "Offering) involve a speculative investment with substantial risks. If the
> assets of the Company are diminished, the Investor may lose his or her
> entire investment. Persons who are not sophisticated in these types of
> offerings and who cannot afford the loss of their entire investment <u>should
> not</u> purchase the Investment offered hereby.

> <u>Risk Factors</u>. The purchase of the securities offered hereby is subject to a
> high degree of risk. Prospective investors should consider the following
> factors, among others, before investing. Prospective investors are urged to
> consult their own financial, tax and legal counsel in connection with the
> possible purchase of any securities and to conduct their own due diligence.

78. In Utah state court case 160100092, Tamio and Anna each admitted as true in their

September 28, 2016 *Amended Answer* at ¶ 88 that:

> Tamio, Anna, and/or Star Mountain also failed to inform [plaintiffs in the
> Utah state court case Michiko Stehrenberger, Francine Yeh, and Ken Hsieh]
> of Landmark's written risk disclosures.

79. Defendants Tamio and Anna did not tell Michiko or the other investors in connection

with the sale of the securities even about the very existence of the written "Risk Factors"

or the warning that they could lose their entire investment.

80. The Landmark investment was not actually backed by any real property as collateral, and

was therefore an "unsecured" investment from the moment Defendants first sold the Star

Mountain-issued securities in August 2006 to gain custody of the investment money of

Plaintiff Michiko, Francine, and Ken.

81. Defendants Tamio and Anna fraudulently misrepresented the risk nature of the investment

from the very first moment they obtained investors' money, in connection with the sale of

the Star Mountain-issued promissory note securities.

82. According to the deposition transcript of Mr. Cary Valerio as the Managing Member of

Landmark Venture Capital, LLC/Bray-Conn, in describing the Landmark investment in

another securities fraud case, Mr. Valerio stated:

> [W]e knew our interest rate at the time for Landmark was 72 percent a
> year" and "If you're going to secure it, then you're not going to get
> anybody to do 6 percent a month.

83. The annual 72 percent return is equivalent to a 6 percent return each month on the

invested principal dollar amount.

84. Defendant Tamio and/or Anna pooled together approximately $2.2 million of various

investors money into an account under their control, and invested it with Landmark's self-

described "high-risk" investment, but without telling Plaintiff Michiko, Francine, or Ken.

85. Defendant Tamio has produced account statements for his and/or Star Mountain's

accounts with Landmark/Bray-Conn reflecting monthly "earnings payments" received

into their accounts that equated approximately, with minor variations, to that same 6

percent monthly return based upon the approximately $2.2 million balance. Ex. 8.

86. The Landmark investment offered Star Mountain (and Tamio and Anna) a substantially

higher 72% rate of return (approximately 6% per month) in exchange for the higher-risk

to the investment money of Michiko, Francine Yeh, and Ken Hsieh.

87. Defendants Tamio and Anna did not tell Michiko or the other investors in connection

with the sale of the securities that Tamio and Anna did not actually have sufficient money

to "guarantee" Michiko's. Francine's, and Ken's investments against total loss because

Tamio and Anna themselves had gambled a substantial portion of their financial reserves

by placing it in the same high-risk Landmark investment as part of the $2.2 million

pooled money of multiple investors.

88.  Defendants Tamio and Anna did not tell Michiko and other investors that on August 8,
2006 and 28, 2006, one or both of them caused Star Mountain to switch Michiko's
investment money instead into the self-described "high-risk" investment with
Landmark/Bray-Conn.

89.  The monthly interest-rate differential between what Landmark promised to pay Star
Mountain (72% per year; 6% per month) and what Star Mountain promised to pay its
investors Michiko and Francine Yeh (at 24% per year, 2% per month) amounts to a
contractual 4% per month secret profit (or 48% in profits skimmed by the Defendants per
year on their combined $253,500 invested)) and an additional 4.5% per month
Defendants intended to skim off of on Ken Hsieh's $17,000.00 invested (18% per year,
1.5% per month).

90.  At the time that Tamio and Anna offered the Star Mountain promissory note securities,
Tamio and Anna failed to disclose to Michiko, Francine Yeh, or Ken Hsieh that they
and/or Star Mountain intended keep the direct or indirect benefit of the skimmed dollar
amounts each month for their own purposes.

91.  Tamio and Anna did not disclose the existence of Landmark's written "high-risk"
warnings to Michiko, Francine Yeh, and Ken Hsieh because they anticipated that
Michiko, Francine, and Ken would refuse to invest their money if they knew the true
"high-risk" to their investments.

92.  In omitting and failing to disclose the written "high-risk" warnings of total loss of
investors' money related to the Landmark investment, as admitted in Tamio's and Anna's
September 28, 2016 *Amended Answer* in Utah state case 16010092, Tamio and Anna

obtained the money of investors Michiko Stehrenberger, Francine Yeh, and Ken Hsieh in exchange for the Star Mountain promissory note securities (dated December 23, 2006, January 25, 2007, and two notes dated April 23, 2007) under false pretenses, a false representation (in failing to disclose the material fact of the existence of the written "high-risk" warnings about the investment) and actual fraud.

93. In their roles related to Star Mountain Enterprises, LLC, Tamio and Anna (a) omitted and failed to disclose the existence of the written "high-risk" warnings they received related to the Landmark investment while Tamio and Anna represented to investors Michiko, Francine, and Ken that investing through Tamio, Anna, and Star Mountain was "safe," "guaranteed," and "backed by real estate" as collateral for the investment; (2) Tamio and Anna each admit they received the Landmark written "high-risk" warnings of the risk of total loss to the investors' investment but failed to disclose it in connection with receiving the investors' money in exchange for the Star Mountain promissory note securities, because (3) Tamio and Anna intended to benefit directly or indirectly from the difference in interest paid to Star Mountain by Landmark in exchange for the higher risk than what Star Mountain was to pay Michiko, Francine, and Ken and could only receive these benefits for themselves by deceiving Michiko, Francine, and Ken by not telling them about the "high-risk" of total loss of the investment; (4) Michiko, Francine, and Ken relied upon Tamio's and Anna's representations as true, but did not know that Tamio and Anna omitted and failed to disclose the existence of the Landmark written "high-risk" warnings of total loss of their investment; and (5) Michiko, Francine, and Ken were damaged by Tamio's and Anna's omissions, misrepresentations, and fraud because Star Mountain did not repay their investment to them once Landmark failed to return the

investment to Star Mountain and claimed it as a business failure related to that "high-

risk."

B. <u>Violations as unlicensed securities agents and employing unlicensed securities
agents: Defendants' fraud in concealing the act that they were receiving
remuneration by switching the investment into a different "high-risk" investment
that allowed them to secretly skim a percentage from their investors.</u>

94. Defendants Tamio and Anna admitted in their September 28, 2016 *Amended Answer* in

Utah state case no. 160100092 at ¶ 250 that: "Under Utah Code Ann. § 61-1-3(1)::

> It is unlawful for a person to transact business in this state as a [securities]
> agent unless the person is licensed under this chapter.

95. Additionally, employing an unlicensed securities agent is also a violation of the Utah

Securities Act, under Utah Code Ann. §  61-1-3(2)(a)(1):

> It is unlawful for a broker-dealer or issuer to employ or engage an agent
> unless the agent is licensed.

96. Defendants Tamio Stehrenberger and Anna Stehrenberger admitted in their September 28,

2016 *Amended Answer* at ¶ 15 that:

> Tamio did not disclose to Michiko that the State of Utah requires Tamio to
> have a securities license to be able to lawfully 'pool' the funds of multiple
> investors.

97. Tamio and Anna admit as true in their September 28, 2016 *Amended Answer* in Utah state

court case number 160100092 at ¶ 60, 249 that:

> Certificates obtained from the Utah Division of Securities Custodian of
> Records indicate that Defendants SME [Star Mountain Enterprises, LLC],
> Tamio, and Anna have "never been licensed as a broker-dealer, agent or
> investment adviser, investment adviser representative in Utah.

98. That the State of Utah requires a securities license to be able to lawfully "pool" the

money of multiple investors together with the money of others, and that Tamio and Anna

failed to disclose to Michiko and Francine  that Tamio and Anna were therefore each

required to obtain their own securities license before "pooling" Michiko's and Francine's

money, was an omission of fact and a violation of the Utah Securities Act, Utah Code

Ann. § 61-1-1, *et seq.*.

99.    Defendant Tamio acted as a securities agent by selling promissory note securities related

to or on behalf of Star Mountain Enterprises, LLC.

100.    Defendant Anna acted as a securities agent by selling promissory note securities related

to or on behalf of Star Mountain Enterprises, LLC.

101.    In exchange for selling Star Mountain-issued securities, Defendants Tamio and/or Anna

received direct and indirect financial benefits including showing the commingled and

pooled approximately $2.2 million of multiple investors held in account under their

control by claiming it as their own assets, which Defendant Tamio did in or about May

15, 2008 to obtain a $572,000.00 loan from EAG Investments, LLC.

102.    Defendant Star Mountain Enterprises, LLC employed securities agents by utilizing

Defendants Tamio and/or Anna to sell promissory note securities related to or on behalf

of Star Mountain Enterprises, LLC and providing Tamio and/or Anna with direct or

indirect remuneration in exchange.

103.    Under the definitions section of the Utah Securities Act, Utah Code Ann. § 61-1-13,

Defendant Star Mountain Enterprises, LLC is an "issuer" of the promissory note

securities related to Michiko Stehrenberger, Francine Yeh, and Ken Hsieh.

104.    Utah Code Ann. § 61-1-13(1)(u) states:

(i) "Issuer" means a person who issues or has outstanding a security that it
has issued. . . (v) With respect to interests in partnerships, general or
limited, "issuer" means the partnership itself and not the general partner
or partners.

105. Under the Utah Securities Act's "definitions" section, Utah Code Ann. § 61-1-13(1)(b)(i) and (ii), a securities "agent" is a person who represents an "issuer" (such as Star Mountain) and sells or purchases securities on behalf of that issuer, and who receives remuneration in exchange for that sale or purchase:

> (i) "Agent means an individual other than a broker-dealer who represents a[n] . . . issuer in effecting or attempting to effect purchases or sales of securities.

> (ii) "Agent" does not include an individual who represents: (A) an issuer, who receives no commission or other remuneration, directly or indirectly, for effecting or attempting to effect purchases ore sales of securities in this state, and who effects transactions . . . [list then includes other excepted types of transactions not applicable here]

106. Utah Code Ann. § 61-1-13(1)(b)(ii) is clear that the receipt of any type of "remuneration, directly or indirectly" in exchange for the sale or purchase of a security requires a securities license to do so lawfully.

107. Defendant Tamio met with persons interested in investing, and told those persons about the Star Mountain-related investments.

108. Defendant Anna met with persons interested in investing, and told those persons about the Star Mountain-related investments.

109. In April 2007, Tamio and Anna met with Michiko Stehrenberger and described a "guaranteed" and "low-risk" investment to Michiko through which Michiko would invest money with their entity, Star Mountain Enterprises, LLC, through promissory notes.

110. Defendant Tamio engaged in activities with persons interested in investing in Star Mountain-related investments that resulted in Star Mountain Enterprises, LLC receiving money into Star Mountain's accounts related to Star Mountain-issued promissory notes.

111. Defendant Anna engaged in activities with persons interested in investing in Star

Mountain-related investments that resulted in Star Mountain Enterprises, LLC receiving money into Star Mountain's accounts related to Star Mountain-issued promissory notes.

112. Defendant Tamio directly or indirectly caused to be sold the Star Mountain-issued promissory notes to Plaintiff Michiko.

113. In exchange for Tamio's discussions with Michiko about the Star Mountain-related investments, Star Mountain received at least $100,000.00 into its accounts(s) from Michiko.

114. In exchange for Tamio's discussions with Michiko about the Star Mountain-related investments, Star Mountain received money into its accounts(s) from Michiko.

115. Defendant Anna directly or indirectly caused to be sold the Star Mountain-issued promissory notes to Plaintiff Michiko.

116. In exchange for Anna's discussions with Michiko about the Star Mountain-related investments, Star Mountain received at least $100,000.00 into its account(s) from Michiko.

117. In exchange for Anna's discussions with Michiko about the Star Mountain-related investments, Star Mountain received money into its account(s) from Michiko.

118. Defendant Tamio sold the Star Mountain-issued promissory notes to Francine Yeh and in exchange, Star Mountain received at least $153,000.00 into its account(a) from Francine.

119. Defendant Tamio caused to be sold the Star Mountain-issued promissory notes to Francine Yeh directly or indirectly, and in exchange, Star Mountain received money into its account(a) from Francine.

120. Defendant Tamio offered his mother, Aichu Yeh, a financial incentive in exchange for Aichu persuading Francine Yeh to invest money with Star Mountain.

121. Defendant Anna directly or indirectly offered Aichu Yeh a financial incentive in exchange for Aichu persuading Francine Yeh to invest money with Star Mountain.

122. The financial incentive Defendant Tamio offered to Aichu Yeh included payment to Aichu of a percentage of the monthly return that Star Mountain, Tamio, and/or Anna received related to Francine Yeh's investment.

123. The financial incentive Defendant Anna offered to Aichu Yeh directly or indirectly included payment to Aichu of a percentage of the monthly return that Star Mountain, Tamio, and/or Anna received on Francine Yeh's investment.

124. In exchange for Tamio's efforts and interactions regarding the Star Mountain-related investments related to Francine Yeh, Star Mountain received at least $153,500.00 into its account(s) from Francine.

125. In exchange for Tamio's efforts and interactions regarding the Star Mountain-related investments related to Francine Yeh, Star Mountain received money into its account(s) from Francine.

126. Defendant Anna directly or indirectly caused Star Mountain-issued promissory notes to be sold to Francine Yeh.

127. In exchange for Anna's efforts and interactions regarding the Star Mountain-related investments related to Francine Yeh, Star Mountain received at least $153,500.00 into its account(s) from Francine.

128. In exchange for Anna's discussions with Francine Yeh about the Star Mountain-related investments, Star Mountain received money its account(s) from Francine.

129. Defendant Tamio wrote checks, or otherwise caused payments to be made, to Aichu Yeh related to Francine Yeh's investment with Star Mountain.

130. Defendant Anna wrote checks, or otherwise caused payments to be made, to Aichu Yeh related to Francine Yeh's investment with Star Mountain.

131. Defendant Tamio directly or indirectly caused the Star Mountain-issued promissory notes to be sold to Ken Hsieh through Tamio's mother, Aichu Yeh.

132. Defendant Anna directly or indirectly caused the Star Mountain-issued promissory notes to be sold to Ken Hsieh through Tamio's mother, Aichu Yeh.

133. Defendant Tamio offered his mother, Aichu Yeh, a financial incentive in exchange for Aichu persuading Ken Hsieh to invest money with Star Mountain.

134. Defendant Anna offered Aichu Yeh a financial incentive in exchange for Aichu persuading Ken Hsieh to invest money with Star Mountain.

135. The financial incentive Defendant Tamio offered to Aichu Yeh included payment to Aichu of a percentage of the monthly return that Star Mountain, Tamio, and/or Anna received related to Ken Hsieh's investment.

136. Aichu Yeh received remuneration related to the sale and purchase of the Star Mountain-issued promissory notes to Francine Yeh and Ken Hsieh in the form of a percentage of the monthly return related to Star Mountain's receipt of Francine Yeh's and Ken Hsieh's money.

137. Aichu Yeh's activities related to the Star Mountain-issued promissory notes and money received by Star Mountain, Tamio, and/or Anna from Francine Yeh and Ken Hsieh constitute the activities of an unlicensed securities agent.

138. In exchange for Tamio's efforts and interactions regarding the Star Mountain-related investments related to Ken Hsieh, Star Mountain received at least $17,000.00 into its account(s) from Ken.

139. In exchange for Tamio's efforts and interactions regarding the Star Mountain-related investments related to Ken Hsieh, Star Mountain received money into its account(s) from Ken.

140. Defendant Anna directly or indirectly caused the Star Mountain-issued promissory notes to be sold to Ken Hsieh.

141. In exchange for Anna's efforts and interactions regarding the Star Mountain-related investments related to Ken Hsieh, Star Mountain received at least $17,000.00 into its account(s) from Ken.

142. In exchange for Anna's efforts and interactions regarding the Star Mountain-related investments related to Ken Hsieh, Star Mountain received money into its account(s) from Ken.

143. Defendant Tamio wrote checks, or otherwise caused payments to be made, to Aichu Yeh related to Ken Hsieh's investment with Star Mountain.

144. Defendant Anna wrote checks, or otherwise caused payments to be made, to Aichu Yeh related to Ken Hsieh's investment with Star Mountain.

145. Aichu Yeh held no license with the State of Utah or the Utah Division of Securities that authorized her to sell securities or the Star Mountain-issued promissory notes.

146. Aichu Yeh was neither a Utah-state licensed securities agent nor a licensed investment advisor.

147. In paying or causing to be paid to Aichu Yeh a financial incentive in exchange for Star Mountain receiving money from Francine Yeh, Defendant Tamio directly or indirectly employed an unlicensed securities agent or unlicensed investment advisor.

148. In paying or causing to be paid to Aichu Yeh a financial incentive in exchange for Star

Mountain receiving money from Ken Hsieh, Defendant Tamio directly or indirectly employed an unlicensed securities agent or unlicensed investment advisor.

149. In paying or causing to be paid to Aichu Yeh a financial incentive in exchange for Star Mountain receiving money from Francine Yeh, Defendant Anna directly or indirectly employed an unlicensed securities agent or unlicensed investment advisor.

150. In paying or causing to be paid to Aichu Yeh a financial incentive in exchange for Star Mountain receiving money from Ken Hsieh, Defendant Anna directly or indirectly employed an unlicensed securities agent or unlicensed investment advisor.

151. In paying or causing to be paid to Aichu Yeh a financial incentive in exchange for Star Mountain receiving money from Francine Yeh, Defendant Star Mountain Enterprises, LLC directly or indirectly employed an unlicensed securities agent or unlicensed investment advisor.

152. In paying  or causing to be paid to Aichu Yeh a financial incentive in exchange for Star Mountain receiving money from Ken Hsieh, Defendant Star Mountain Enterprises, LLC directly or indirectly employed an unlicensed securities agent or unlicensed investment advisor.

153. Defendants' failure to themselves clearly disclose to Francine Yeh and Ken Hsieh their illegal employment of an unlicensed securities agent in connection with the sale or purchase of the Star Mountain-issued promissory note securities constituted the omission of a material fact in connection with the sale or purchase of those securities, in violation of the Utah Securities Act's "anti-fraud" provision, Utah Code Ann. § 61-1-1(2).

154. In or about August 2006, Defendant Star Mountain Enterprises, LLC contracted with Landmark/Bray-Conn to receive a 72% annual return (60% monthly "earnings payment"

each month) through the Landmark promissory notes.

155. Defendants Tamio, Anna, and/or Star Mountain Enterprises, LLC raised money from investors and eventually commingled and "pooled" together approximately $2.2 million to invest in the Landmark promissory notes.

156. The Landmark/Bray-Conn investment had a minimum dollar amount "buy-in" threshold and a restriction on the number of "Accredited Investors" (with a minimum amount of assets or net worth) that Landmark/Bray-Conn was legally allowed to accept into the investment.

157. Defendant Tamio, unable to meet the minimum dollar amount threshold on his own to be legally allowed to invest with Landmark/Bray-Conn and receive the 72% annual returns, falsified an "Accredited Investor Questionnaire" and "Subscription Agreement" and misrepresented that the commingled, "pooled" money of multiple investors were instead his own assets, or Star Mountain's assets, to meet that threshold.

158. But for Defendant Tamio's intentional misrepresentation of the true source of the assets utilized to qualify to invest with Landmark/Bray-Conn in the "Accredited Investor Questionnaire,""Subscription Agreement," and other misrepresentations or omissions of material facts made to Landmark/Bray-Conn and to investors Plaintiff Michiko, Francine Yeh, and Ken Hsieh, upon which they relied, Michiko's, Francine's, and Ken's money would not have been put into the "high-risk" Landmark/Bray-Conn investment and they would not have suffered the resulting losses.

159. Defendants Tamio, Anna, and Star Mountain Enterprises were not licensed as securities agents when they raised money from investors and then commingled and "pooled" together the money of multiple investors to invest into the Landmark promissory notes.

160. Based upon the 72% interest Landmark/Bray-Conn promissory notes paying Defendant Star Mountain Enterprises a higher return on Star Mountain's commingled and "pooled" investors' money each month (6% per month) than the Star Mountain had contracted to pay Star Mountain's investors on their 18%-24% promissory notes (1.5%-2% each month), Tamio, Anna, and/or Star Mountain received possession, custody, or control of a 4% to 4.5% interest rate spread as a result of Defendants' efforts and interactions in raising investment money from investors, selling the Star Mountain-issued promissory notes, and causing Star Mountain to purchase the higher-yield, self-described "high-risk" Landmark promissory note securities.

161. Defendants Tamio, Anna, and/or Star Mountain Enterprises received "remuneration, directly or indirectly" related to their efforts and interactions in selling the Star Mountain-issued promissory note securities to Michiko, Francine, and Ken in exchange for Star Mountain having contracted to pay them at a 18%-24% monthly rate, and in causing Star Mountain to purchase the Landmark promissory note securities for which Star Mountain had contracted to receive from Landmark the much higher 6% monthly rate in exchange for the "high-risk" imposed upon the money of Michiko, Francine, and Ken.

162. Prior to, or on or about April 23, 2007, Defendants Tamio, Anna, and Star Mountain did not disclose to Plaintiff Michiko that Tamio, Anna, and/or Star Mountain would be receiving any remuneration in connection with the sale of the April 23, 2007 Star Mountain-issued promissory notes.

163. Defendant Tamio had signed a July 18-20, 2005 "Holding Account Agreement" with Plaintiff Michiko, in which Tamio agreed that he would not take any compensation percentage related to Michiko's investments.

164. In connection with the sale of the April 23, 2007 Star Mountain-issued promissory notes to Plaintiff Michiko, Defendants Tamio, Anna, and/or Star Mountain concealed the fact that they had contracted to receive a higher interest rate from Landmark/Bray-Conn and that they would take a percentage of the money Landmark/Bray-Conn paid related to Michiko's investment.

165. Defendants Tamio, Anna, and Star Mountain thereafter fraudulently concealed the fact each month that Defendants either received, or had contracted with Landmark/Bray-Conn to receive, monthly "earnings payments" from which one or more of the Defendants would take other payment or remuneration. Ex. 8.

166. Plaintiff Michiko only learned of Defendants' remuneration arrangement related to her investment after the April 23, 2007 date of the Star Mountain-issued promissory notes and after Michiko had already paid her $100,000.00 to Defendants.

167. Defendants Tamio, Anna, and Star Mountain failed to disclose the remuneration arrangement related to Defendants secretly skimming a percentage from the returns purportedly generated by Plaintiff Michiko's $100,000.00 investment money.

168. Plaintiff Michiko learned of the Defendants' secret skimming of a percentage, and their undisclosed remuneration arrangement, from others, but these disclosures were not made by Defendants Tamio, Anna, or Star Mountain directly to Michiko.

169. Defendants Tamio, Anna, and/or Star Mountain denied the percentage-skimming remuneration arrangement even after it was discovered by Michiko from other sources.

170. Defendants Tamio, Anna, and/or Star Mountain perpetuated a fraud and continued to perpetuate the fraud against Plaintiff Michiko and the other investors by denying concealing their percentage-skimming remuneration arrangement.

171. In early discovery related to Utah state court case 080402986, Defendant Tamio provided copies of financial account statements with Landmark/Bray-Conn showing the $2.2 million of the commingled "pooled" investors money of multiple investors, but Tamio intentionally omitted other portions of the statements that showed that an "earnings payment" of approximately 6% per month (72% per year) was also paid by Landmark/Bray-Conn to Tamio and/or Star Mountain into that account, based upon the commingled, "pooled" investors' money.

172. Plaintiff Michiko later obtained copies of the omitted financial account statements that revealed that Landmark/Bray-Conn had paid "earnings payments" of approximately 6% every month (72% per year) based upon the commingled, "pooled" money of the investors. Ex. 8.[1]

173. If not for the investors having invested their money with Star Mountain, and their money then being commingled and "pooled" into the $2.2 million, Defendants would not have received the 6% per month on that $2.2 million from which Defendants skimmed a percentage for their own remuneration.

174. Landmark/Bray-Conn's "high-risk" investment failed and Landmark/Bray-Conn failed to repay the investment.

175. In or about July 2007, Landmark/Bray-Conn offered a rescission to Star Mountain and Landmark's other investors, whereby Landmark/Bray-Conn would only pay a 1% monthly "earnings payment" instead.

176. An offer of rescission constitutes a new sale or purchase of a security.

---

1   The Landmark/Bray-Conn documents are a matter of public court record in other cases (of which the Court may take judicial notice) and are incorporated herein by reference into this *Amended Complaint.*

177. Defendants Tamio, Anna, and/or Star Mountain caused Star Mountain to enter into a new purchase of a Landmark promissory notes with the 12% annual return.

178. Defendants knew or should have known at least as of July 2007 that Star Mountain, in having contracted to receive 1% per month while having already contracted to pay out 1.5%-2% per month to investors Michiko, Francine, and Ken, that Star Mountain would be unable to sustain making payments from the investment.

179. Defendant Tamio then sought to obtain a equity loan or home equity line of credit to pay Star Mountain's investors.

180. Plaintiff Michiko's two Star Mountain-issued promissory notes for a combined total $100,000.00 had a maturity date of June 1, 2008, for which Star Mountain was required to repay the entire $100,000.00 in full.

181. Defendant Tamio contacted Plaintiff Michiko in or about May-June 2008 and explained that Star Mountain's repayment of all of Michiko's investment would be late, but that Tamio was planning on getting a new home loan or home equity line of credit to pay Michiko off from that other payment source instead.

182. In or about October-November 2007, Defendant Anna indicated by email that she and/or Tamio could not return Michiko's money because they had had a new baby and could not "raise new funds" from which to repay all of Michiko's investment.

183. The payment to investors from a source of funds different from the source identified as the original investment constitutes a Ponzi scheme, which is an unlawful investment scheme .

184. Defendant Star Mountain failed to repay the investment to Michiko, Francine, and Ken.

185. Defendants Tamio and Anna refused to honor the "guarantee" they had described to

Michiko, Francine, and Ken in connection with the sale of the Star Mountain-issued promissory notes.

186. Defendant Star Mountain, through the efforts of its Managers/Members Defendants Tamio and Anna, had contracted to receive "remuneration, directly or indirectly" related to the sale of the Star Mountain-issued promissory note securities because Star Mountain's purchase of the Landmark/Bray-Conn "high-risk" promissory note securities provided Star Mountain the contractual right to receive a substantial interest-rate differential for itself.

187. The interest-rate differential between 6% per month, contracted to be paid to Star Mountain by Landmark based upon the amount of money raised from investors by Star Mountain, Tamio, and Anna, versus the 1.5% to 2% per month Star Mountain contracted to pay its investors including Michiko, Francine, and Ken, is 4% to 4.5% per month remuneration.

188. Put another way, Defendant Star Mountain had entered into contractual arrangements with Landmark's higher-paying (but high-risk) investment that allowed Star Mountain to secretly skim percentages of money each month from Star Mountain's own investors, without telling its investors either about the skimmed money or the higher risk level, and then the investors lost their money and Defendants attempted to hide their liability for their fraud behind Star Mountain's limited liability company protections.

189. Defendants Tamio and Anna, as the Managers/Members of Star Mountain, also received direct and indirect remuneration in exchange for Tamio's and Anna's efforts resulting in the sale of the Star Mountain-issued promissory note securities to Michiko, Francine, and Ken, and Star Mountain's purchase of the Landmark promissory note securities.

190. Defendants Tamio and Anna acted as unlicensed securities agents, on behalf of issuer Star Mountain, and they each received remuneration directly or indirectly in connection with their efforts resulting in the sale and purchase of the Star Mountain and Landmark securities, and concealed the facts of these layerings of fraud, thereby violated the Utah Securities Act's licensing and anti-fraud provisions, Utah Code Ann. § 61-1-3 and § 61-1-1(2), respectively.

191. Defendants additionally commingled and "pooled" the money of multiple investors including the money of Michiko, Francine, and Ken, without Defendants having a securities license authorizing them to lawfully do so, and then "seasoned" this commingled money in their accounts to then defraud others by using the assets to falsely qualifying for new loans, including a new loan of $572,000.00 from EAG Investments, LLC to purchase a luxury home on or about May 15, 2008,.

192. Defendants received direct or indirect remuneration form their sale of the Star Mountain-issued promissory note securities to raise new money to place into their accounts, including using the commingled "pooled" funds of investors to obtain more money by fraudulently claiming that money as their own assets, to qualify for the purchase of multiple exotic cars and other luxury homes.

C. Exception to discharge for violations of securities laws and the willful and malicious acts intended to injure the property of others under § 523(a)(6); support for a statutory award of treble damages for "reckless and intentional acts."

193. Defendants Tamio's, Anna's, and/or Star Mountain's reckless and intentional pattern of misrepresentation and fraud in connection with their sale of the Star Mountain-issued promissory note securities has led to substantial losses for Plaintiff Michiko, Francine Yeh, Ken Hsieh, EAG Investments, and others.

194. In 2015, the bankruptcy court for the District of Utah, through the Honorable R. Kimball Mosier determined that Tamio had engaged in a pattern of loan fraud against Zions Bank related to the purchase of a Lamborghini, and that court denied discharge of a third-party debtor's debts as a result of Tamio's fraud.

195. Defendant Tamio violated the Sarbanes-Oxley Act by fraudulently certifying the 2013 and 2014 10-K Annual Reports of Reve Technologies, Inc. and omitting the material fact from the Annual Reports that Tamio was being sued for securities fraud.

196. Under Utah Code Ann. § 61-1-22(2):

> The court in a suit brought under Subsection (1) may award an amount equal to three times the consideration paid for the security, together with interest, costs, and attorney fees, less any amounts, all as specified in Subsection (1) upon a showing that: (a) the violation was reckless or intentional.

197. Defendants Tamio, Anna, and/or Star Mountain Enterprises acted willfully and knowingly with the intention of switching the investment money of Plaintiff Michiko, Francine Yeh, and Ken Hsieh into Landmark Venture Capital/Bray-Conn in exchange for a contractual higher rate of return from Landmark/Bray-Conn.

198. Defendants Tamio, Anna, and/or Star Mountain Enterprises acted willfully and knowingly with the intention of switching the investment money of Plaintiff Michiko, Francine Yeh, and Ken Hsieh into Landmark Venture Capital/Bray-Conn in exchange for a contractual higher rate of return from Landmark/Bray-Conn in exchange for a higher-degree or risk to Michiko's, Francine's, and Ken's investment.

199. Defendants Tamio, Anna, and/or Star Mountain Enterprises acted willfully and knowingly with the intention of switching the investment money of Plaintiff Michiko, Francine Yeh, and Ken Hsieh into Landmark Venture Capital/Bray-Conn's higher-risk

investment without Tamio or Anna having sufficient financial reserves outside of the Landmark/Bray-Conn investment to support the "guarantee" they had promised to Michiko, Francine, and/or Ken.

200. Defendants Tamio, Anna, and/or Star Mountain Enterprises acted intentionally and/or recklessly in putting the money of Plaintiff Michiko, Francine Yeh, and Ken Hsieh into Landmark's self-described "high-risk" investment without telling Michiko, Francine, or Ken about the high-risk of loss of their entire investments.

201. Defendants Tamio, Anna, and/or Star Mountain Enterprises acted intentionally and/or recklessly by not telling Plaintiff Michiko, Francine Yeh, and Ken Hsieh that Defendants had received Landmark's "Confidential Memorandum" document containing warnings that the Landmark investment was "high-risk" and that their entire investment could be lost, and by Defendants putting the money of Michiko, Francine, and Ken into Landmark's self-described "high-risk" investment without Michiko's, Francine's, or Ken's knowledge or permission.

202. The level of risk in a particular investment is a material fact to an investors' decision to invest money in that investment.

203. In the time span between 2005 and 2008, Defendant Tamio Stehrenberger considered the risk level of the Landmark/Bray-Conn-issued promissory note securities to be a material fact to an investor's decision whether or not to invest with Star Mountain.

204. In the time span between 2005 and 2008, Defendant Tamio Stehrenberger considered the risk level of the Landmark/Bray-Conn-issued promissory note securities to be a material fact to an investor's decision whether or not to invest with Star Mountain or Landmark/Bray-Conn.

205. In the time span between 2005 and 2008, Defendant Anna Stehrenberger considered the risk level of the Landmark/Bray-Conn-issued promissory note securities to be a material fact to an investor's decision whether or not to invest with Star Mountain.

206. In the time span between 2005 and 2008, Defendant Anna Stehrenberger considered the risk level of the Landmark/Bray-Conn-issued promissory note securities to be a material fact to an investor's decision whether or not to invest with Star Mountain or Landmark/Bray-Conn.

207. In the time span between 2005 and 2008, Defendant Tamio Stehrenberger considered the risk level of the Landmark/Bray-Conn-issued promissory note securities to be a material fact to an investor's decision whether or not to invest with Star Mountain.

208. In the time span between 2005 and 2008, Defendant Star Mountain Enterprises, LLC considered the risk level of the Landmark/Bray-Conn-issued promissory note securities to be a material fact to an investor's decision whether or not to invest with Star Mountain or Landmark/Bray-Conn.

209. Defendants Tamio, Anna, and Star Mountain Enterprises knowingly, or with reckless disregard, and prior to Plaintiff Michiko's, Francine Yeh's, and Ken Hsieh's investment with Star Mountain, directly or indirectly made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements not misleading in light of the circumstances under which they were made.

210. Plaintiff Michiko, Francine Yeh, and Ken Hsieh lost money as a direct and proximate result of Defendants' failure to disclose the written risks of the Landmark investment.

211. Had Defendants not concealed the existence of the "high-risk" written warnings in connection with their sale of the Star Mountain-issued promissory notes, Michiko,

Francine, and Ken would not have agreed to invest their money with Star Mountain or

Landmark/Bray-Conn, and would not have suffered the loss of their money.

## COUNT FOUR:
### Exception to discharge related to fraud (Star Mountain Enterprises)
### under 11 U.S.C. § 523(a)(2)(A)

212. Plaintiff re-alleges and incorporates by reference all other facts, allegations and exhibits

set forth in this and the other sections of this *Amended Complaint.*

213. Under 11 U.S.C. § 523(a)(2)(A), an individual's debt is not discharged "for money,

property, services, or an extension, renewal, or refinancing of credit, to the extent

obtained by (A) false pretenses, a false representation, or actual fraud . . ."

214. As 11 U.S.C. § 523(a)(19)(A)(ii) most specifically addresses fraud related to the sale,

purchase, or manipulation of securities, those facts constituting Defendants' additional

fraudulent acts that occurred outside the scope of the sale or purchase transactions, such

as Defendants' fraudulent concealment of their switch to Landmark/Bray-Conn through

which concealment Defendants obtained an implicit extension or renewal of the money

they received, and Defendants' concealment of Landmark's/Bray-Conn's investor update

letters alerting investors to Landmark's regulatory troubles and the quick steps they

would need to be able to preserve their investment against competing claims from the

other Landmark investors and further loss as the Landmark ship was going down, and

other fraudulent acts or acts of omission that caused delay and resulted in additional

damages to Plaintiff Michiko, Francine, and Ken.

215. To the extent the claims are not excepted under 11 U.S.C. § 523(a)(19) under the

narrower scope of the sale or purchase of the securities, the fraud or misrepresentation

elements of 11 U.S.C. § 523(a)(2)(A) are separately satisfied.

**COUNT FIVE:**
**Exception to discharge related to willful and malicious acts (Star Mountain Enterprises)**
**under 11 U.S.C. § 523(a)(6)**

216. Plaintiff re-alleges and incorporates by reference all other facts, allegations and exhibits set forth in this and the other sections of this *Amended Complaint.*

217. The "willful" element under § 523(a)(6) is met because Defendants Tamio, Anna, and/or Star Mountain intended to cause injury and damages (financial loss) to Plaintiff Michiko, Francine Yeh, and Ken Hsieh, or believed injury and damages (financial loss) would result) in Defendants concealing the switch to the "high-risk" Landmark/Bray-Conn investment to gain the higher 72% interest rate, and then concealing the percentage-skimming remuneration on the interest-rate differential between what Landmark/Bray-Conn paid and what Star Mountain was required to pay Michiko, Francine, and Ken, that which Defendants kept in an undisclosed separate account, and which had it not been skimmed should have belonged to the investors and would have lessened the investors' losses at the end when Landmark/Bray-Conn failed to repay the investment.

218. The "willful" element under § 523(a)(6) is met because Defendants Tamio, Anna, and/or Star Mountain  or Defendants believed injury and damages (financial loss) would result from their actions, which is also why they kept their acts secret until long after Landmark/Bray-Conn had failed to repay the investment.

219. Investor Francine Yeh is an elderly relative who mortgaged her home, which had previously been paid off, in order to borrow the $153,500.00 that she invested with the Defendants.

220. Defendant Tamio even accompanied Francine to the Washington Mutual Bank branch to speak to the loan officer on her behalf.

221. The "malicious" element under § 523(a)(6) is met because Defendants had no just cause
or excuse to engage in the conduct they did and knew that it would cause injury and
damages (financial loss) to Plaintiff Michiko, Francine Yeh, or Ken Hsieh.

### COUNT SIX:
**Exception to discharge related to EAG Investments, LLC judgment
under 11 U.S.C. § 523(a)(2)(B)**

222. Plaintiff re-alleges and incorporates by reference all other facts, allegations and exhibits
set forth in this and the other sections of this *Amended Complaint.*

223. On January 4, 2011, the Third Judicial District Court for the State of Utah entered default
judgment against Defendant Tamio Stehrenberger in the amount of $548,408.17 in the
matter of *EAG Investments, LLC v. Tamio Lucien Stehrenberger, et al.*.Ex. 6.

224. On February 20, 2019, the Utah state court renewed the EAG Judgment in the amount of
$1,163, 310.92 accrued as of December 31, 2018, and ordered Plaintiff Michiko formally
substituted as the Successor Judgment Creditor to former plaintiff EAG. Ex. 6.

225. 11 U.S.C. § 523(a)(2)(B) provides that a debt will not be discharged in bankruptcy
proceedings if the debt was obtained through:

> use of a statement in writing—(i) that is materially false; (ii) respecting the
> debtor's or an insider's financial condition; (iii) on which the creditor to
> whom the debtor is liable for such money, property, services, or credit
> reasonably relied; and (iv) that the debtor caused to be made or published
> with intent to deceive.

226. Defendant made written statements to EAG Investments respecting his financial
condition that were materially false by misrepresenting the (approximately) $2.2 million
commingled "pooled" money of multiple investors as Tamio's own assets to qualify for
and obtain a $572,000.00  loan, upon which EAG relied and then lost money, and at a
time when Tamio was aware that the entirety of this $2.2 million did not belong to him,

and was held under the custody of Landmark/Bray-Conn, who had already informed

Tamio that the $2.2 million was at serious risk of not being able to be repaid (or

otherwise may have been lost) in time for EAG's June 20, 2008 repayment deadline,

follows:

227. Between August 2006 and 2007, Defendant Tamio caused the commingled "pooled"

money of Plaintiff Michiko and other investors Francine Yeh, Ken Hsieh, and others, to

be placed into an investment account with Landmark Venture Capital, LLC/Bray-Conn.

228. Previously, in or about 2005, Defendant Tamio sent Plaintiff Michiko an email in which

Tamio described how to "season" the money belonging to other people by depositing it

into his own bank account for a period of a few months, whereby banks typically only

ask for about three months' worth of the most recent bank statements as proof of funds in

consideration for a new loan, and that Tamio would then misrepresent the higher

"pooled" account balance his bank account statements to qualify for obtain new loans.

229. Defendant Tamio advised Plaintiff Michiko that she could borrow more money and then

invest the borrowed money with Tamio, Anna, and/or their companies.

230. Defendant Tamio indicated to Plaintiff Michiko that "seasoning" the money belonging to

others in an account held in one's own name for a few months and then representing that

pooled money of others as one's own assets was legal.

231. Defendant Tamio indicated to Plaintiff Michiko that pooling the money of others into

one's account to qualify for new loans was regularly being done to raise new money

among the people with whom Tamio was acquainted.

232. A "Verification of Deposit" ("VOD") is what a prospective borrower obtains from the

accounts holding the pooled money and provides to the prospective lender.

233. Plaintiff Michiko declined Defendant Tamio's advice that she should "season" the money or misrepresent her assets to a lender to qualify for and obtain new loans to invest because it felt dishonest, but at the time, back in 2005, did not think that her brother Tamio would involve himself in outright fraud.

234. In or about March 15, 2008, Defendant Anna declined Plaintiff Michiko's request to provide Michiko with a Verification of Deposit of Michiko's own $100,000.00 investment; Anna claimed that people could use the V.O.D. to defraud others, and Anna thereby indicated that she was well aware of how the fraudulent "seasoning" and loan application scheme worked.

235. Between August 2006 and at least May 2007, Defendants Tamio and/or Anna secretly caused the money of Plaintiff Michiko and other investors to be commingled and "pooled" together and then placed into the Landmark/Bray-Conn investment in exchange for promissory notes bearing an annual interest rate of 72% on the larger "pooled" amount of money of others.

236. At the time, Plaintiff Michiko was unaware that Defendants had raised as much as $2.2 million and pooled it together, and were engaged in fraudulent "seasoning" and misrepresentations of their financial account balances on a much larger scale, as part of their loan application fraud scheme.

237. Defendants Tamio and/or Anna caused the approximately $2.2 million, comprised of the pooled money of numerous investors including Plaintiff Michiko, to be placed into an account with Landmark/Bray-Conn (Account 10032).

238. In Utah state court case number 16010092, co-debtors Tamio and Anna admit in their September 28, 2016 *Amended Answer* at ¶ 159 that "'Account 10032 held approximately

$2.2 million."

239. Account 10032 with Landmark/Bray-Conn was related to money invested through the
Star Mountain-issued promissory notes through Star Mountain Enterprises, LLC but the
account information was shown online instead under the personal name of Tamio
Stehrenberger.

240. By July of 2007, Landmark/Bray-Conn indicated it was being investigated by securities
regulators for possible violations of securities laws, and offered a rescission of the
Landmark/Bray-Conn 72% interest notes to rescind and replace them instead with a much
lower 12% interest notes and a possible, and notably vague but not contractually-required
nor guaranteed, "profit sharing" in the investment.

241. In or about July of 2007, Defendants Tamio and Anna were aware that the Landmark
rescission to 12% per year was less than what Star Mountain owed its investors on its
promissory notes.

242. In or about July of 2007, Defendants Tamio and Anna were aware that there was a serious
risk that the $2.2 million of investors' money held in the Landmark/Bray-Conn Account
10032 was not guaranteed to be repaid to Star Mountain, or to Star Mountain's investors.

243. In or about July of 2007, Defendants Tamio and Anna were aware that there was a serious
risk that the Landmark/Bray-Conn investment and the Account 10032 holding
approximately $2.2 million was in danger of Landmark/Bray-Conn having lost that
money or otherwise being unable to repay it.

244. On or about November 14, 2007, Defendants Tamio and/or Anna received notice from
Landmark/Bray-Conn that the ability for Landmark/Bray-Conn to make its payments was
in trouble due to issues with securities investigations through a letter, as signed by

Landmark's Managing Member, Mr. Cary Valerio, Ex. 7, and stating in relevant part:

> After the Rescission back in July, some investors did cho[o]se to exercise their right to rescind. This amount happened to be more than we had originally budgeted for, and is now due back to our investors ASAP. Some funds have been paid back, but we still have a substantial amount that is due. . .. . From October to present we have also had some obstructions to our income stream due to our Texas lease having its production shut down for [] 2-3 weeks due to some well P&A (Plug and Abandon) discrepancies between our records and that of the State. While these discrepancies were being ironed out in the legal system, 'all' of the wells had to be shut down and 'all' production stopped. . . . As most of you know our Private Placement Memorandum is a Reg. D; Section 506. This stipulates that we can have an infinite number of Accredited Investors, but only 35 unaccredited investors. Our initial understanding of how to categorize a multi-member company that invests in our PPM has since been corrected. We were under the opinion that if there are 5 unaccredited investors in the LLC investing with us, that even though there were 5 unaccredited investors you would only have to count the entity as one unaccredited entity. This is true 'if' the 5 unaccredited member investment companies have only a portion of their funds with us...But 'if' they have invested all of their funds with us, then we have to count all 5 of those unaccredited investors toward our total unaccredited allotment of 35. Until we accurately determine the accreditation status of every member of every LLC, and where they have placed their funds, we may be over our 35 limit. Needless to say, we will be paying off quote a few of our unaccredited investor base during the next few months to get this number 'way' below 35. It is in our best interest and yours if we get very conservative with 'how' we count our unaccredited investors. We will be in touch with each of you that are unaccredited, or have multi-unaccredited member LLC's during the next 2 weeks, arranging one on one meetings in our office to discuss this as well as the direction and your future participation with our company )with a tailored win-win solution).
>
> Part 3-Action Plan
> We will continue to pay at least 1%/month as per our agreement, starting with the November interest payment. However, in November there will be no profit sharing payment, as all of those funds will be directed to the payoff of a portion of the unaccredited investors principle [sic], as well as finishing up the rescission principle [sic] payoff. . . . BUT, our ability to do this depends on how many unaccredited investors we have as per the conservative guidelines above. If there are more than anticipated (which is highly likely), then it could delay our resuming a full profit sharing payment until January or possibly later.

> Part 4-New request for Principle [sic] Policy
> Effective immediately, those companies or individuals that request principle [sic] from this point forward will be ineligible for any further profit sharing on their entire principle [sic] balance amount during the six months that they are waiting for their principle [sic] to be returned. They will, however, still receive the 1% monthly disbursement on the entire amount...

245. On or about April 9, 2008, Defendants Tamio and/or Anna received another notice from Landmark/Bray-Conn, Ex. 6, indicating continuing problems with Landmark/Bray-Conn's ability to repay the investments back to investors, and closing the investment:

> We are committed to pay the 12% APR to those who not received a full 12% to date and by the maturity of your promissory note...If you believe that it is in your best interest to request your principle [sic], please contact me and I will get the process started. As you are aware, we are requiring 6 months to withdraw principle [sic] and are working diligently to make sure that we will be able to return your principle [sic] for your cash calls....As of March 31, 2008 we have officially closed Landmark Venture Capital to any new funds. We will not be accepting any further funds into this Debt security from either new investors or existing investors. It will remain closed until we are able to return interest and profit sharing. All future investments will be structure as equity instead of debt.

246. On May 15, 2008, Defendant Tamio applied and received a new $572,000.00 from EAG Investments, LLC, with a 100% repayment due date of June 20, 2008 (a little more than a month later) by providing written statements of his financial condition indicating that Tamio still had the assets he already had been informed by Landmark/Bray-Conn were far from available to repay the EAG loan.

247. On May 15, 2008, Defendant Tamio provided to Mr. Hal Rosen, the Manager of EAG Investments, LLC, a "Uniform Residential Loan Application," Ex. 8,[2] and on page 3, Tamio stated that he had assets in the "BRAE" (Landmark/Bray-Conn) account in the

---

2 These documents (redacted here) were previously filed into Utah state court case number 100401172 by the prior plaintiff, EAG Investments, LLC, and are a matter of public court record, of which the Court may take judicial notice.

amount of $2,234,834.00 as his largest asset, as of that date.

248. In this Uniform Residential Loan Application dated May 15, 2008, Ex. 7, Defendant

Tamio intentionally misrepresented to EAG Investments, LLC, that the "pooled"

approximately $2,234,834.00 million commingled money of Michiko, Francine Yeh, Ken

Hsieh, and others instead as Tamio's own asset to qualify for and obtain a $572,000.00

loan from EAG Investments, LLC.

249. On the May 15, 2008 Uniform Residential Loan Application, Ex. 7, Defendant signed

and acknowledged the following:

> Each of the undersigned specifically represents to Lender . . . and agrees
> and acknowledges that: (1) the information provided in this application is
> true and correct as of the date set forth opposite my signature and that any
> intentional or negligent representation of this information contained in this
> application may result in civil liability, including monetary damages, to any
> person who may suffer any loss due to reliance upon any representation
> that I have made on this application, and/or criminal penalties including,
> but not limited to, fine or imprisonment or both under the provisions of
> Title 18, United States Code, Sec. 1001, et seq. . . . .

250. Defendant Tamio knew at the exact moment of signing the Uniform Residential Loan

Application that he did not own the entirety of the $2,234,834.00 he listed in the

Application.

251. Defendant Tamio did not tell EAG Investments, LLC that he did not own the entirety of

the $2,234,834.00 to correct the amount that he listed on the Uniform Residential Loan

Application.

252. Defendant Tamio signed and provided to EAG Investments a written document titled

"Irrevocable Letter of Assignment and Disbursement," Ex. 7,  purportedly directing

segregating and assigning a portion of the money within Tamio's/Star Mountain's

Landmark/Bray-Conn/BRAE account to EAG Investments, LLC.

253. One of the purpose of Defendant Tamio's decision to misrepresent the $2,234,834.00 of others as entirely his own money, was to offer EAG Investments, LLC a lien on a portion of that money as collateral for the new l$572,000.00 oan –even though Tamio knew that the money was neither all his, nor was he even sure that the money still actually existed after Landmark's/Bray-Conn's recent notices that the investment was being closed down because Landmark/Bray-Conn couldn't reliably pay its investors back their money.

254. The written documents made or provided by Defendant Tamio to EAG Investments were intended to create the impression that Tamio would be able to repay the EAG loan in full by June 20, 2008.

255. EAG Investments, LLC, through its Manager Mr. Hal Rosen, relied upon Defendant Tamio's written statements indicating that Tamio would be able to repay the loan back to EAG, in full, a about month later on June 20, 2008.

256. The Uniform Residential Loan Application, Account 10032 statements, and "Irrevocable Letter of Assignment and DIsbursement" made or  provided by Defendant Tamio to EAG Investments, LLC is "a statement in writing . . . (ii) respecting the debtor's or an insider's financial condition."

257. On May 15, 2008, Defendant Tamio knew at the time of providing these written statements of his financial condition to EAG Investments, LLC that they were false, and Tamio intended that EAG Investments would rely upon the falsity and give him the $572,000.00.

258. Defendant Tamio was aware that EAG Investments, LLC would rely upon his Uniform Residential Loan Information and any other written statements of his financial condition in making its decision whether or not to loan him $572,000.00.

259. EAG Investments, LLC, through its Manager Mr. Hal Rosen, did indeed rely upon Defendant Tamio's Uniform Residential Loan Application, Account 10032 statements, and "Irrevocable Letter of Assignment and Disbursement,"

260. EAG Investments, LLC then suffered losses as a result of its reliance upon Defendant Tamio's written statements containing misrepresentations of his financial condition when the $572,000.00 loan was not repaid in full by the June 20, 2008 agreed date.

261. As further evidence of Defendant Tamio's awareness of the falsity of the Uniform Residential Loan Application he made and provided to EAG Investments on May 15, 2008, Tamio made a very different Uniform Residential Loan Application representing his assets and liabilities to Wachovia Bank just a few days later, on May 19, 2008, in which he represented his assets differently to Wachovia, claiming $306,900.00 in his Checking/Savings accounts and Real Estate Owned at $2,070,000.00.[3]

262. Defendant Tamio knew he did not have enough money to repay EAG Investments, LLC the unpaid amounts on the $572,000.00 loan amount by the June 20, 2008 maturity/due date at the exact moment that Tamio made, signed, and caused to be provided to EAG Investments, LLC his May 15, 2008 Uniform Residential Loan Application.

263. At the exact moment on May 15, 2008 that Defendant Tamio submitted the "Uniform Residential Loan Application" to EAG Investments, LLC to obtain the $572,000.00 loan, Tamio already had information sufficient to know, and in fact did know, that Landmark/Bray-Conn was unable to repay Tamio and Star Mountain's investors enough for Tamio to make payments to EAG Investments, LLC on a new $572,000.00 loan.

---

3   This exhibit contains potentially private information, and is therefore not being filed with the court but is available for *in camera* review.

264. In or about July 2007, Defendants Tamio and/or Anna were aware that the Landmark/Bray-Conn investment was not able to pay as previously agreed under the 72% annual interest promissory notes, and, after Landmark/Bray-Conn made an Offer of Rescission related to the 72% interest rate promissory notes, Defendant Tamio, on behalf of Star Mountain Enterprises, LLC, signed two new promissory notes with Landmark/Bray-Conn that only paid 12% per year (1% per month) to Star Mountain, which was roughly half the 1.5% 2% amount Star Mountain owed each of its investors every month under the Star Mountain-issued promissory notes.

265. At the exact moment that Defendant Tamio provided the written statements to EAG Investments claiming his financial condition as assets totaling $2,234,834.00, Tamio knew that due to receiving 1% month from Landmark/Bray-Conn and payout out 1.5%-2% to Star Mountain's investors, that he would be unable to repay EAG Investments on the June 20, 2008 maturity date on the EAG promissory note.

266. Defendant Tamio failed to repay EAG Investments, LLC the loan on the June 20, 2008 maturity date, and thereafter failed to make any further payments to EAG.

267. Defendant Tamio intended to deceive EAG Investments, LLC and/or its Manager, Mr. Hal Rosen, at the exact moment that Tamio made the statement of his financial condition and supporting Account 10032 statements and caused them to be provided to EAG.

268. If not for Defendant Tamio having provided the false statement of Tamio's financial condition to EAG Investments, LLC, EAG would not have loaned any of the $572,000.00 money to Tamio.

269. If not for Defendant Tamio having provided the false statement of Tamio's financial condition to EAG Investments, LLC, EAG would not have suffered any loss or damages

related to loaning Tamio the $572,000.00.

270. EAG Investments, LLC was damaged as a direct result of its reliance upon Defendant

Tamio's misrepresentations regarding his assets, money, and property in connection with

qualifying for the $572,000.00.

271. The Utah state court awarded EAG Investments, LLC default judgment against

Defendant Tamio on January 4, 2011 in the judgment amount of $548,408.17. Ex. 5.

272. Under the community property laws of the States of California and Idaho, the marital

community of Defendants Tamio Stehrenberger and Anna Stehrenberger (and their

bankruptcy estate) are jointly and severally liable upon the judgment.

273. Defendant Tamio Stehrenberger's misrepresentations and omissions (including the

Uniform Residential Loan Applications to EAG Investments,as compared to his loan

application on an identical form to Wachovia Bank a few days later with different

claimed assets, the Irrevocable Assignment and Disbursement letter that Tamio caused to

be made and delivered to EAG Investments, LLC purporting to be additional security to

EAG for Tamio's repayment of the loan, each constitute separate instances of loan

application fraud and false statements made by Tamio to EAG regarding his financial

condition, in connection with a new $% loan, are excepted from discharge under 11

U.S.C. § 523(a)(2)(B).

274. Defendant Tamio caused to be converted the EAG Investments, LLC loan for Tamio's

own use and benefit, with no intention of repaying the money he obtained through false

pretenses.

275. Nondisclosure of a material fact in the face of a duty to disclose may also be used to

establish the requisite reliance and causation elements for actual fraud. *In re Apte,* 96 F.3d

1319, 1323 (9th Cir.1996)). Allegations concerning Debtors' ability to pay are also

relevant to the fraudulent promise analysis. *See In re Lee,* 186 B.R. 695, 699 (9th Cir.

BAP 1995) (mere failure to fulfill a promise to pay debt is dischargeable, unless the

debtor made the promise while knowing that payment would be impossible).

276. "Fraudulent intent may be established by circumstantial evidence, or by inferences drawn

from a course of conduct." *In re Devers,* 759 F.2d 751, 753-54 (9th Cir. 1985). Therefore,

in determining whether the debtor had no intention to perform, a court may look to all the

surrounding facts and circumstances. *In re Mereshian,* 200 B.R. 342, 347 (9th Cir. BAP

1996).

277. "While the doctrine of issue preclusion applies in bankruptcy dischargeability litigation, a

bankruptcy court retains exclusive jurisdiction to determine whether a debt is

dischargeable." *Grogan v. Garne*r, 498 U.S. 2799, 284 n. 11 (1991); the matter of whether

or not the debt owed on the EAG judgment is excepted from discharge therefore arises

for the first time in the Bankruptcy Court.

278. Between 2017 and 2020, Defendants utilized surveillance cameras at their residences.

279. Between 2017 and 2020, Defendants utilized the surveillance cameras to intentionally

evade service of various court orders compelling Tamio to appear for a judgment debtor's

exam of his assets, through which Tamio would have been required to answer under oath

as to the precise facts of the fraud committed to enable the claw-back of any fraudulently

transferred assets.

280. Defendants' intentional evasions, delays, and fraudulent concealment of the facts known

to them regarding the warnings for Landmark/Bray-Conn's impending failure related to

the misrepresentations made to EAG Investments, LLC, which concealment caused

further losses related to the dissipation of Defendants' assets leading up to their bankruptcy filing while they sought to delay repayment on the judgment (thereby receiving an extension to which they were not entitled), and constitute separate fraudulent concealment acts well after the judgment was rendered, and for which the debt is separately excepted from discharge under 11 U.S.C. § 523(a)(2)(A).

### COUNT SEVEN:
### Exception to discharge related to EAG Investments, LLC judgment under 11 U.S.C. § 523(a)(6)

281. Plaintiff re-alleges and incorporates by reference all other facts, allegations and exhibits set forth in this and the other sections of this *Amended Complaint*.

282. The exemption from discharge under 11 U.S.C § 523(a)(6) of debts for willful and malicious injuries is the most broad exemption in 11 U.S.C § 523(a) and encompasses the majority of intentional torts. It is well settled what is required to show whether an injury is willful and malicious - the "willful" injury requirement as used in § 523(a)(6) is met where an actor intends to cause the injury that is a consequence of the act or believes it is substantially certain to result; and, the "malicious" injury requirement is met where the actor is without just cause or excuse. *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62, 118 S. Ct. 974 (1998); *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1208 (9th Cir. 2001) (noting that "a debtor must will or desire the harm, or believe that injury is substantially certain to occur as a result of his behavior before a resulting debt will be excepted from discharge under § 523(a)(6).").

283. Courts in the Fifth, Seventh, Ninth, and Tenth Circuits have read § 523(a)(6) so broadly as to even include judgment debts for breach of contract where the debtor committed a

knowing breach of conduct and engaged in tortious conduct such that the breach evinces

a malicious intent to cause injury through the breach. *See Petralia*, 238 F.3d at 1205-07

(holding that a knowing breach of a contact constitutes a nondischargeable debt under §

523(a)(6) when the breach is accompanied by malicious and willful conduct); *Spring*

*Works, Inc. v. Sarff (In re Sarff),* 242 B.R. 620, 626 (B.A.P. 6th Cir. 2000)(holding that

damages for a breach of contract can be nondischargeable under § 523(a)(6), but that the

plaintiff must show "the defendant intended to cause harm by breaching the contract").

284. Based upon the facts alleged, Defendant Tamio on the May 15, 2008 date of signing and

providing the written statements of his financial condition to EAG Investments, LLC, had

knowledge that the money invested into the Landmark/Bray-Conn investment had been

lost in whole or in part, or that Tamio would be unable to repay EAG Investments, LLC

by the June 20, 2008 due date, and in so doing, Defendant Tamio's acts were both willful

and malicious.

285. The "willful" element under § 523(a)(6) is met because Defendant Tamio either intended

to cause injury and damages (financial loss) to EAG Investments, LLC, or believed injury

and damages (financial loss) would result to EAG Investments, LLC from Tamio's

written statements and misrepresentation that Tamio had sufficient assets available to

repay the $572,000.00 loan to EAG on the June 20, 2008 due date, even when Tamio

knew those assets had already been lost, and were not available to make the repayment.

286. The "malicious" element under § 523(a)(6) is met because Defendant Tamio had no just

cause or excuse to cause injury and damages (financial loss) to EAG Investments through

his written statements misrepresenting his financial condition and claiming to have assets

that he knew had already been lost, and were not available to make the repayment.

287. The terms of the EAG Investments, LLC Trust Deed promissory note, as signed by Defendant Tamio, Ex. 7, allows for reimbursement for attorney fees, costs, and interest at the contractual rate of 14% per year. The Utah state court judgment, Ex. 5, awarded the base amount "together with post-judgment interest at the rate of 14% per annum from the [January 4, 2011] date hereof until paid, plus post judgment accruing fees and costs."

288. All of the EAG Investments, LLC's claims against Defendant Tamio (as transferred to Plaintiff Michiko, as the court-ordered Successor Judgment Creditor in the February 20, 2019 order, Ex. 5, ¶ 4) are traceable back to Tamio's fraudulent written statements regarding his financial condition, and therefore all related interest, attorney fees, costs, and other relief should likewise be excepted form discharge under § 523(a)(6).

**COUNT EIGHT:**
**Exception to discharge for fraudulent transfer of $25,917.14 to Defendant Tamio under 11 U.S.C. § 523(a)(6)**

289. Plaintiff re-alleges and incorporates by reference all other facts, allegations and exhibits set forth in this and the other sections of this *Amended Complaint.*

290. Non-party Taanen, LP is one of the Defendant Tamio's and Anna's other expired Utah shell companies and was a defendant in the underlying Utah case.

291. Defendants Tamio and Anna have used Taanen, LP to evade the reach of their creditors, including Plaintiff Michiko, by hiding the ownership of their assets, including the corporate shares in Reve Technologies, Inc., an entity in which Tamio was the CEO and sole employee, but for which the corporate shares were purchased and sold instead through Taanen, LP's name.

292. Defendants Tamio and Anna previously formed Taanen, LP and then let it expire as an entity, and then formed it again just days before receiving an approximately $25,000.00 payment for a portion of Tamio's shares in the Reve Technologies, Inc. corporation he ran as the sole CEO and employee for years.

293. The Utah state court in its August 24, 2017 final order determined that Taanen, LP wrongfully received the transfer of assets from the other defendants, that all such transfers of assets are reversed, and that Taanen is jointly and severally liable for damages in that case.

294. During the relevant time periods, Defendants had utilized Taanen, LP as an alter ego, opening new bank accounts and new lines of credit in that entity's name so as to keep their assets and liabilities out of their own names for the purpose of evading their creditors and prospective creditors.

295. Defendants Tamio and Anna then caused Taanen, LP to file its Chapter 7 petition in the District of Utah on June 2, 2019, (case no. 19-24016-RKM) and the automatic stay in that case is still in effect pending resolution of this District of Idaho case.

296. Taanen, LP's Chapter 7 Trustee, Mr. Philip G. Jones, filed a Proof of Claim in this District of Idaho case against Defendant/Debtor Tamio based upon the fraudulent transfer of $25,917.15 made on July 23, 2015 based upon admissions made by Tamio to that Trustee.

297. According to Taanen, LP's bank statements, Taanen was otherwise insolvent on the July 23, 2015 date that Defendant Tamio, as General Partner of Taanen, LP, caused Taanen to transfer $25,917.15 into Tamio's personal bank account.

298. Upon information and belief, Taanen, LP received no equivalent value for the $25,917.15 money transferred into Tamio's personal bank account.

299. The "badges of fraud" may be summarily pled to the Rule 8(a) standard rather than the Rule 9(b) heightened standard of "actual fraud" pleading, and the Court and Defendants may refer to the elements of the badges of fraud to supplement the allegations pled here.

300. Taanen listed only four creditors in its petition and schedules: Michiko, Francine, Ken, and U.S. Bank on a $5,000 credit card; Francine and Ken have previously transferred all of their right, title, and interest in their claims against Taanen or the Defendants and have no further claims (they received timely notice of events in that case and did not appear to challenge the transfer), and U.S. Bank neither appeared nor filed any Proof of Claim in Taanen's Chapter 7 case at all..

301. Plaintiff Michiko is the sole creditor to have filed a Proof of Claim in Taanen, LP's Chapter 7 Utah case.

302. Upon information and belief and the facts known at this time, other than the Taanen estate's administrative costs and fees, there are no other assets and no other creditors of the Taanen estate with valid claims besides Michiko.

303. Upon information and belief, Taanen, LP's estate at this time lacks sufficient assets to hire Idaho-licensed counsel to commence its own adversary case seeking to except from discharge of the debts owed by Tamio to Taanen, LP as a result of his receipt of the fraudulent transfer of the $25,917.15 from Taanen, LP.

304. Under Fed. R. Civ. P. 17(a), and 25(c), a real party in interest may join or be substituted into the case and have the claims relate back to the date of filing.

305. Upon information and belief, Plaintiff Michiko, as the sole creditor of the Taanen estate, is a real party in interest or otherwise  has standing to pursue the Taanen estate's exception to discharge claim (and potentially the fraudulent transfer claim if abandoned,

assigned, or otherwise not pursued by Taanen's estate).

306. The "willful" element under § 523(a)(6) is met because Defendant Tamio either intended
to cause injury and damages (financial loss) to the present and future creditors of Taanen,
LP  (including Plaintiff Michiko, with whom he had been engaged in defending a
securities fraud lawsuit since 2008) by disregarding the Taanen Partnership Agreement
and its terms and requirements and his fiduciary duties to it, and thereby depriving
Taanen of all of its remaining assets all at once and then using Taanen's money for his
own purposes, or Tamio believed injury and damages (financial loss) would result

307. The "malicious" element under § 523(a)(6) is met because Defendant Tamio had no just
cause or excuse to cause injury and damages (financial loss) to Taanen, LP and its
creditors, or to disregard all Partnership formalities and deplete the entirety of Taanen's
assets and money instead for  his own purposes.

**COUNT NINE:**
**Exception to discharge under 11 U.S.C. § 523(4) as to decedent's estate**
**(defalcation in fiduciary duty, embezzlement, larceny)**

308. Plaintiff re-alleges and incorporates by reference all other facts, allegations and exhibits
set forth in this and the other sections of this *Amended Complaint.*

309. Upon information and belief, Defendants Tamio and/or Anna were appointed or served in
the role of personal representatives, administrators or executors of the estate of Plaintiff
Michiko's and Defendant Tamio's mother, Aichu C. Yeh.

310. Under Cal. Probate Code §§1600, *et seq*., a trust was imposed for benefit of the heirs or
beneficiaries of the decedent's estate, and corresponding fiduciary duties imposed by law
upon the personal representatives, and Defendants Tamio and/or Anna owed a fiduciary
duty to the heirs and/or beneficiaries of the decedent's estate.

311. Defendants Tamio and/or Anna, in acting as personal representatives for the decedent's estate, or as the administrators, executors, or in serving a similar role in determining matters related to the estate of Aichu C. Yeh, failed to notify, or otherwise concealed from Michiko all notices, events, rights to preserve claims, and other timely and important matters related to the administration or disposition of the estate.

312. Defendants Tamio and Anna have sought to punish Plaintiff Michiko emotionally in retaliation for Plaintiff's securities fraud litigation and other litigation pending against them.

313. Prior to the decedent's passing, Defendants received government assistance for caring for the decedent before her death, but declined to notify Michiko of how and when (or if) Michiko could visit her mother in person, prior to her mother's passing.

314. Prior to the decedent's passing, Defendants controlled or attempted to control and block certain family members from being able to visit in the hospital or nursing home.

315. Defendants knew that death was rapidly approaching, but declined to notify Plaintiff that her mother was not just in the hospital for a temporary medical procedure, but instead was considered to be in hospice, with no expectation of recovery.

316. It is unclear from the lack of notice where the decedent last lived or resided at the time of her passing (and which court would have jurisdiction over her estate matters, if any), and how the matters of the decedent's estate was handled.

317. Plaintiff Michiko has property that was being held by the decedent prior to her death that has not been recovered, and claims against the decedent's estate for which she was entitled to receive notice to make her claims during the administration or other handling of the estate matters.

318. Upon information and belief, Defendants Tamio and/or Anna in violation of their fiduciary duties have fraudulently, intentionally, and maliciously converted, embezzled, stolen, or misappropriated for their own uses the property of Aichu C. Yeh's estate that actually belongs to all of the heirs or beneficiaries, or have otherwise distributed the property for improper motives and purposes, which has resulted in a loss to the decedent's estate and beneficiaries.

319. Upon information and belief, Defendants Tamio and/or Anna fraudulently, intentionally, and maliciously converted assets and personal items of Aichu Yeh, including items of sentimental value, depriving Plaintiff Michiko of the right to receive sentimental property as an heir or beneficiary of their mother's estate, or of the opportunity to offer to purchase or make arrangements to care for and preserve such sentimental property, if none of the other heirs or beneficiaries desired to care for and preserve them.

320. Defendants Tamio and Anna have repeatedly claimed to have "lost" items in storage, including for every single year of their tax returns spanning between 2005 and 2017, from which it can be inferred that these Defendants have not properly preserved property of the decedent's estate for benefit of the heirs either.

321. Defendants Tamio and Anna have intentionally deprived Plaintiff Michiko of notice regarding the administration or distribution of her mother's estate, and all deadlines for claims or actions to be taken related thereto.

322. Plaintiff Michiko has sought to obtain discovery from Defendants regarding key facts in this matter, but for years Defendants have evaded service and otherwise ignored all requests for information of any kind, even in violation of the Utah state court two discovery orders and discussion of sanctions to include striking these Defendants'

defenses as to one of the key claims in the Utah state court case.

323. Defendants in their petition and schedules were required to identify all property in their possession, and Plaintiff first learned that certain of the items likely belonging to the decedent's estate have been revealed to be in Defendants' possession or control.

324. But for Defendants' years of concealment, Plaintiff Michiko would have been able to locate the proper court,  documents, timelines, and other information related to her mother's estate.

325. Plaintiff Michiko requests the relief from this Court of compelling Defendants to provide a detailed and accurate accounting of all of assets and other matters related to the estate of Aichu C. Yeh to allow the parties to determine the appropriate notice, liability, and remedy, and the whereabouts of any sentimental items the Defendants have concealed..

326. Under California Probate Code § 9050.7, Defendants were required to provide notice to the decedent's creditors, and under California Probate Code §§ 9600-9606:

> (a) If a personal representative breaches a fiduciary duty, the personal representative is chargeable with any of the following that is appropriate under the circumstances:

> (1) Any loss or depreciation in value of the decedent's estate resulting from the breach of duty, with interest.

> (2) Any profit made by the personal representative through the breach of duty, with interest.

> (3) Any profit that would have accrued to the decedent's estate if the loss of profit is the result of the breach of duty.

> (b) If the personal representative has acted reasonably and in good faith under the circumstances as known to the personal representative, the court, in its discretion, may excuse the personal representative in whole or in part from liability under subdivision (a) if it would be equitable to do so.

327. Defendants Tamio and/or Anna obtained the decedent's estate property by fraudulent

means, and retained it by fraudulent concealment, thereby defalcating in their fiduciary duties, and converting, embezzling, stealing, or misappropriating property belonging to the decedent's heirs or beneficiaries, including Plaintiff Michiko, and Defendants' financial liability for their actions are nondischargeable under 11 U.S.C. § 523(a)(2).

328. California law imposes a fiduciary duty on personal representatives, administrators, and executors of an estate, or those performing a similar function, and Defendants through their actions defalcated in their duties, and the debts incurred thereby are excepted from discharge under 11 U.S.C. §523(a)(4).

329. Defendants Tamio and/or Anna knew, or should have known, that their acts would cause injury, damage, and harm to the heirs or beneficiaries of the decedent's estate, and the debts and liabilities incurred are excepted from discharge under 11 U.S.C.§ 523(a)(6).

330. Defendants Tamio's and Anna's acts were willful, intentional, and malicious, and the debts incurred (the financial equivalent needed to restore the tangible losses incurred by Plaintiff Michiko for the property Defendants misappropriated, converted, mis-distributed, or otherwise failed to preserve), are hereby also excepted from discharge under 11 U.S.C. § 523(a)(6). The court in *In re Klause*, 181 B.R. 487, 493 n. 4 (Bankr. C.D.Cal.1995) has stated that it "cannot conceive of a fact situation under § 523(a)(2) that would not also support a judgment under § 523(a)(6)".

**COUNT TEN:**
**Determination of Priority, Validity, and Extent of Liens under Fed. R. Bankr. P. 7001**

331. Plaintiff re-alleges and incorporates by reference all other facts, allegations and exhibits set forth in this and the other sections of this *Amended Complaint.*

332. The creation and perfection of the liens, and any applications of 11 U.S.C. §§ 541, 547,

and 548 appropriate thereto, are requested to be determined to resolve any controversy.

333. On May 24, 2017, Plaintiff Michiko Stehrenberger filed a Notice of Judgment Lien with the California Secretary of State regarding her judgment in the matter of *EAG Investments, LLC v. Tamio Lucien Stehrenberger, et al.*. Ex. 9.

334. In or about June-July 2020, Defendant Tamio electronically filed papers into the matter of *EAG Investments, LLC v. Tamio Lucien Stehrenberger, et al.*.in the Orange County Superior Court for the State of California, and consented to receipt of electronic service from the other parties in the case.

335. In or about June 10, 2020, Defendant Tamio listed his residence address with the Orange County Superior Court as one located in Aliso Viejo, California.

336. On July 9, 2020, Plaintiff Michiko caused to be served by email upon Defendant Tamio by electronic service the Orange County Superior Court's *Order to Appear and Be Examined*, and accompanying papers in support of taking the judgment debtor's exam of Tamio's assets and income, through the court-approved e-filing/e-service system. Ex. 9.

337. On July 10, 2020, Plaintiff Michiko served Defendant Tamio of the Orange County Superior Court's *Order to Appear and Be Examined* and accompanying papers in support of the judgment debtor's exam. Ex. 9.

338. On July 14, 2020, the Kent County Superior Court of the State of Delaware issued a writ of attachment upon garnishee Opkix, Inc. in the Kent County matter of *EAG Investments, LLC v. Tamio Lucien Stehrenberger, et al.*.

339. On July 17, 2020, the New Castle County Sheriff completed service of the writ and levy upon Opkix, Inc. in the Kent County matter of *EAG Investments, LLC v. Tamio Lucien Stehrenberger, et al.*.Ex. 9.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff Michiko Stehrenberger respectfully requests this Court:

(a) Determine that Michiko Stehrenberger's claims related to the Star Mountain
Enterprises-related securities fraud order in the matter of *Overland Associates, LLC, et
al. v. Star Mountain Enterprises, LLC; Tamio Stehrenberger; Anna Stehrenberger; et
al.* in the Utah state court (case number 160100092 and its related case numbers) are
excepted from discharge under the appropriate provisions of 11 U.S.C. § 523(a)(2),(4),
and (19);

(b) Determine that the debt referenced in Plaintiff Michiko's February 26, 2021 Proof of
Claim (claim docket # 25) in the amount of $2,155,348.26 (accrued as of the
September 11, 2020 petition date, plus all interest, attorney fees, and costs accruing
thereafter,), or some other such amount as the Court determines proper, is not
dischargeable and therefore is not discharged under 11 U.S.C. § 523(a)(2)(A),(B), (4),
(6), and/or (19)(which exception shall be specifically identified in the final findings,
conclusions, decree, order, judgment, or other evidence of proceeding);

(c) Determine that Defendants Tamio Stehrenberger and Anna Stehrenberger, and their
marital community, are jointly and severally liable, and vicariously liable, and further
that they are alter egos of Star Mountain Enterprises, LLC, and Taanen, LP, such that
the entity veils are pierced and Tamio, Anna, Star Mountain, and Taanen are declared
alter egos of one another;

(d) Determine that the EAG Investments, LLC judgment, upon which Michiko
Stehrenberger has become the Successor Judgment Creditor, is excepted from
discharge under 11 U.S.C. § 523(a)(2)(B) and/or (6);

(e) Determine that debt referenced in Plaintiff Michiko's February 25, 2021 Proof of Claim
(claim docket # 24) in the amount of $1,296,404.38 (accrued as of the September 11,
2020 petition date, plus all interest, attorney fees, and costs accruing thereafter,), or
some other such amount as the Court determines proper, is not dischargeable and
therefore is not discharged under 11 U.S.C. § 523(a)(2)(B) and (6)(which exception
provisions shall be specifically identified in the final findings, conclusions, decree,
order, judgment, or other evidence of proceeding);

(f) Determine that Defendant Tamio received the fraudulent transfer of at least $25,917.15
(or some other amount the Court deems proper) from Taanen, LP; that Plaintiff
Michiko is the real party in interest, or successor, to the Taanen estate claim, or that the
real party in interest be joined in this adversary case, and that the transfer be reversed
and that Defendant Tamio's debt for receipt of the transfer is excepted from discharge
under 11 U.S.C. § 11 U.S.C. § 523(a)(6) or other provision;

(g) Determine that a fiduciary duty was imposed upon Defendants related to the decedents'
estate, compel an accounting of all assets and liabilities in the estate and complete
reporting of any disposition and distribution made thereof, determine the liability and
amount of damages related to Defendants' handling of the decedent's estate related to
Plaintiff's Proof of Claim filed February 26, 2021 (claim docket # 26), and determine
those amounts as excepted from discharge under 11 U.S.C. § 523(2),(4),(6) or other
provision;

(h) Determine the priority, validity, and extent of Plaintiff Michiko's liens against the
bankruptcy estate, and determine property of the estate under 11 U.S.C. § 541;

(i) Determine that any fraudulently or voidably transferred assets or property made to any

of the John Doe defendants be identified and reversed for the benefit of the estate;

(j) Enter judgment in Michiko Stehrenberger's favor on her *Adversary Complaint* and all

claims or requests for relief made herein, or in any amendments thereto;

(k) Award attorney fees, costs, and pre-judgment and post-judgment interest, expenses, and

all other amounts and relief that the Court deems proper, equitable, and just.

RESERVATION OF RIGHTS

Plaintiff Michiko Stehrenberger respectfully reserves the right to join additional parties,

including those "John Doe" defendants who have not yet been identified, and to amend, revise,

supplement, or otherwise adjust her allegations, claims, defenses, and prayer for relief.


Respectfully submitted March 11, 2021, in Santa Rosa Valley, CA.

Michiko Stehrenberger, listed creditor
2500 Blanchard Road
Santa Rosa Valley, CA 93012
document.request@gmail.com
*email service required*
(206) 229-4415