## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| **IN RE:**<br><br>**TAMIO L. STEHRENBERGER and ANNA C. STEHRENBERGER,**<br><br>     **Debtors.** | **Case No. 20-00833-NGH** |
| **MICHIKO STEHRENBERGER,**<br><br>          **Plaintiff,**<br><br>**v.**<br><br>**TAMIO L. STEHRENBERGER, ANNA C. STEHRENBERGER, TIMOTHY R. KURTZ, INTERNAL REVENUE SERVICE, STAR MOUNTIAN ENTERPRISES, LLC AND JOHN DOES 1-100,**<br><br>          **Defendants.** | **Adv. No. 20-06044-NGH** |

## MEMORANDUM OF DECISION

Before the Court is a nondischargeability action filed by Michiko Stehrenberger against Tamio and Anna Stehrenberger.[1]  A trial was held on the matters May 9–12,

---

[1] Because the parties share the same last name, the Court will address each party by their first name to avoid confusion.  The Court means no offense.

MEMORANDUM OF DECISION - 1

2023.  The parties then submitted written closing arguments on June 2, 2023, after which
the Court took the matters under advisement.[2]  After considering the record, arguments of
the parties, and applicable law, the following constitutes the Court's findings,
conclusions, and disposition of the issues.  Fed. R. Bankr. P. 7052.[3]

**BACKGROUND**

There is significant history between the parties.  Plaintiff Michiko Stehrenberger is
Defendant Tamio Stehrenberger's older sister.  At all relevant times, Anna Stehrenberger
was married to Tamio—though the two have since separated.

### A.    Star Mountain Enterprises

At some point in 2005, Tamio approached Michiko about the possibility of
investing in a holding account with Founders' Capital.  On July 18, 2005, Tamio and
Michiko entered into a holding account agreement.  Ex. 8.  Under this agreement,
Michiko would make deposits to a joint account shared with Tamio and Tamio would
then deposit the funds into a Founders' Capital account that accrued 1.5% monthly
interest.  Per the agreement, Michiko initially invested $30,733.  This agreement included
a provision that Tamio would "personally guarantee the full refund of the principal dollar
amounts, including 1.5% monthly interest rate/compounded amounts due."

---

[2] Michiko also filed a motion for leave to file amended closing arguments and rebuttal to the defendants'
closing arguments.  Doc. No. 309.  However, the parties discussed the schedule of the closing briefs at the
trial and agreed to submit simultaneous written closings on June 2, 2023, rather than having staggered due
dates with opportunities for rebuttal.  As such, the Court will deny Michiko's request.

[3] Unless otherwise indicated, all statutory citations are to the Bankruptcy Code, Title 11 U.S.C. §§ 101–
1532.  Additionally, all citations to "Rule" are to the Federal Rules of Bankruptcy Procedure and all
citations to "Civil Rule" are to the Federal Rules of Civil Procedure.

In May 2006, Tamio and Anna formed Star Mountain Enterprises, LLC ("Star Mountain"), a Utah limited liability company, with both acting as managers. Star Mountain's main purpose was to manage investments. *See* Ex. 3 at 1018. Tamio formed Star Mountain to handle various transactions and avoid being exposed to personal liability.

There was significant testimony about a trip to Switzerland in April 2007 for a family funeral. Michiko, Tamio, and Anna were all present and stayed in the same apartment for a few weeks. During this time, Michiko asserts the parties engaged in several conversations about investment opportunities and "hard money loans." Michiko describes Tamio and Anna as enthusiastically participating in these conversations and seemed excited about the prospective investment opportunities. However, Tamio refutes this characterization and Anna asserts she was not an active participant in these conversations.

Soon after the conversations in Switzerland, Michiko signed two promissory notes with Star Mountain, one for $65,000 and one for $35,000.[4] Ex. 8 at 1081–84. These promissory notes were drafted by Michiko and replaced the initial holding account agreement. Under the new promissory notes, the loan would accrue interest at a rate of 24% per annum, or 2% per month. Michiko would receive monthly interest payments, and the loan would not be re-paid for a minimum of one year. Unlike the holding

---

[4] A portion of the funds provided by Michiko under the promissory notes are the same funds Michiko had previously provided under the holding account agreement. *See* Ex. 2017. As such, Michiko's investment totaled $100,000.

account agreement, the April 2007 promissory notes did not provide for a personal guarantee by Tamio and did not specify what type of accounts the loan funds would be invested in. However, Michiko testified it was her understanding that the funds would be invested in hard money backed investments.

In the fall of 2006, shortly after Star Mountain was formed but before the entity entered into the promissory notes with Michiko, Star Mountain invested funds with Landmark Bray-Conn. Landmark Bray-Conn used the funds it accumulated from investors primarily to acquire interests in oil and gas leases and generally paid out returns to its investors at a 6% monthly interest rate, or 72% per annum. Ultimately, Star Mountain had $2,213,500 invested in its account with Landmark Bray-Conn, including funds provided by Michiko, other investors, and Tamio and Anna personally.[5] *See* Ex. 2051. However, issues began to arise with the Landmark Bray-Conn investment. Tamio testified there were issues with the equipment and the oil and gas investments were no longer producing at the expected levels. On December 18, 2007, Star Mountain put in a cash call to withdraw its entire investment from Landmark Bray-Conn, which was to be paid out on June 18, 2008. Ex. 2051. On May 27, 2008, Tamio attempted to withdraw some of the funds before the cash-call date, stating "we're needing to find a way to keep our heads above water." A representative for Landmark Bray-Conn denied the request but gave no indication that the entity was not going to be able to honor the June 18

---

[5] The other investors included Francine Yeh and Ken Hsieh. A number of the allegations made by Michiko include circumstances involving both Yeh and Hsieh. However, Michiko did not present significant evidence regarding Yeh and Hsieh's involvement.

MEMORANDUM OF DECISION - 4

deadline. Ex. 2049. Ultimately, however, the cash call was not paid out and Tamio received news from Landmark Bray-Conn that they would not be able to fulfill the request.

On March 28, 2008, Tamio received a letter from the State of Utah's Department of Commerce Division of Securities. Ex. 1 at 1001. In this letter, the Department informed Star Mountain of its concerns that the entity was selling securities and requested documentation of Star Mountain's offers and sales of investment opportunities. *Id.* The Department indicated it closed its investigation in September 2008. Ex. 2047.

Michiko initiated state court litigation in Utah, asserting claims against Star Mountain, Anna, and Tamio for alleged violations of state securities law. The Utah litigation continued for a significant length of time. On May 1, 2017, default was entered against Anna and Star Mountain. Ex. 23. In the findings of facts for the entry of default, the Utah state court concluded Tamio and Anna were managers of Star Mountain, and as such, under state securities law, both were jointly and severally liable along with Star Mountain. *Id.* However, on October 3, 2017, the default was set aside as to Anna. Ex. 3002. Further, in a hearing on November 28, 2018, the Utah state court indicated it would remove reference to Anna and Tamio's personal liability in the default judgment against Star Mountain and that a trial date would be set on the issue of their liability. Ex. 3000 at 113–14.

### B. EAG Investments

In May 2008, Tamio applied for a loan with EAG Investments to purchase a residence in Draper Heights, Utah. Tamio testified that the application was mostly filled

out by a woman named Elinor Hutcherson, who he believed to be an associate of EAG Investments, and that Tamio merely signed the application.[6]  However, Hal Rosen, manager of EAG Investments, testified that an Elinor Hutcherson had never worked for EAG Investments, and he met her for the first time at the closing.

EAG Investments ultimately lent Tamio $590,000.  Rosen testified the most important aspects when considering extending the loan to Tamio were income and collateral.  The loan was collateralized with the Landmark Bray-Conn account, the Draper Heights home, and a second position security interest in a residence owned by a third party.  As to the Landmark Bray-Conn account, Tamio issued an irrevocable letter of assignment for distributions from the account in favor of EAG.  On the application, Tamio listed that he had $2.2 million in savings.  However, the account Tamio listed was in fact Star Mountain's Landmark Bray-Conn account, not a personal savings account.  Though Rosen was aware of the Landmark Bray-Conn account, he testified he believed the account listed on the application was a separate savings account owned by Tamio.  However, Tamio asserts Rosen knew it was the Landmark Bray-Conn account because the account was described as "BRAE" on the application and Rosen was aware of the account because it served as collateral on the loan and Rosen was in contact with Landmark Bray-Conn to inform them of the irrevocable letter of assignment from Tamio.

Ultimately, Tamio was unable to make the payments owing under the loan.  EAG Investments then sued Tamio in Utah state court, asserting breach of contract and seeking

---

[6] The parties sometimes referred to Elinor Hutcherson as Elinor Hutchinson.

MEMORANDUM OF DECISION - 6

a deficiency judgment.  On January 4, 2010, a default judgment was entered against

Tamio in the EAG Investments lawsuit in the amount of $548,408.17 along with 14%

interest.  Ex. 17 at 1291–92.  The judgment in the EAG lawsuit was subsequently

assigned to Michiko and was renewed on February 20, 2019, in the amount of

$1,163,310.92.  Ex. 24.

### C.    Procedural History

Tamio and Anna filed a voluntary chapter 7 bankruptcy petition on September 11,

2020, staying the ongoing state court litigation with Michiko in Utah.  Case No. 20-

00833-NGH at Doc. No. 1.  On December 11, 2020, Michiko initiated this adversary

proceeding, seeking to have certain debts owed by Tamio and Anna declared

nondischargeable under § 523(a)(2), (4), (6), and (19).[7]  In addition to Tamio and Anna,

Michiko also named the chapter 7 trustee Timothy Kurtz, the Internal Revenue Service,

the California Franchise Tax Board, the Idaho Tax Commission, and John Does 1–1000

as defendants and sought to determine the validity, extent, or priority of certain liens.[8]

A series of pretrial motions seeking to have the complaint dismissed either in

whole or in part ensued.  Defendants Tamio and Anna moved to dismiss the initial

complaint, but Michiko was allowed to amend, and she filed an amended complaint on

---

[7] Michiko also asserted, as part of Count Nine of her second amended complaint, that certain debts
relating to the estate of Aichu C. Yeh's were nondischargeable pursuant to § 523(a)(2)(A), (a)(4), and
(a)(6).  However, at the commencement of the trial, the parties represented to the Court that Michiko was
no longer pursuing these claims and no evidence was presented on the matter.

[8] The California Franchise Tax Board and Idaho Tax Commission were only listed as defendants in
Michiko's initial complaint, and not included in the first or second amended complaints.  Because these
parties were never formally dismissed, the Court now dismisses both pursuant to Civil Rule 4(m) and for
lack of prosecution.

MEMORANDUM OF DECISION - 7

March 11, 2021.  Doc. No. 24.  In the amended complaint, Michiko added Star Mountain as a defendant.  *Id.*  Tamio filed an answer to the amended complaint on May 3, 2021. Doc. No. 44.  On the same day, Anna filed a motion to dismiss counts 1-10 of the amended complaint.  Doc. No. 45.  After a hearing on the matter, the Court dismissed Count 8 with prejudice, and dismissed Counts 6, 7, and 10, but granted leave to file a second amended complaint addressing the deficiencies.  Doc. No. 83.  Further, the Court dismissed Star Mountain as a defendant for lack of subject matter jurisdiction.  Doc. No. 84.  Michiko then filed her second amended complaint on October 12, 2021.  Doc. No. 88.  After further litigation, the Court ultimately dismissed Counts 6 and 7, which dealt with the EAG loan with respect to Anna.  Additionally, the Court dismissed the IRS and the chapter 7 trustee as defendants pursuant to Civil Rule 4(m), and accordingly dismissed Count 10 as well, which dealt with the avoidance of the IRS's tax lien.  Doc. No. 135.

**ANALYSIS**

**A.    Defendants' Liability**

Several of the claims asserted by Michiko against Tamio and Anna involve the actions of Star Mountain.  Generally, under Utah law, a member or manager of a limited liability company cannot be held personally liable for the debts of the limited liability company.  Utah Code Ann. § 48-3a-304(1).  Under Utah law, "a member or manager of a limited liability company may be held 'personally liable for his [limited liability company's] contractual breaches if he assumed personal liability, acted in bad faith, or committed a tort in connection with the performance of the contract.'"  *H&P Invs. v. iLux*

MEMORANDUM OF DECISION - 8

*Cap. Mgmt. LLC*, 500 P.3d 906, 920 (Utah Ct. App. 2021) (quoting *Reedeker v.*

*Salisbury*, 952 P.2d 577, 582 (Utah Ct. App. 1998)).  As such, to the extent Tamio and

Anna actively participated or were responsible for the wrongdoing of Star Mountain,

Tamio and Anna can be held personally liable for debts stemming from such conduct.

**B.    Nondischargeability**

Michiko bears the burden of establishing her claims under § 523(a) by a

preponderance of the evidence.  *Netwest Commc'ns Grp. v. Mills (In re Mills)*, 2008 WL

2787252, at *4 (Bankr. D. Idaho June 25, 2008) (citing *Grogan v. Garner*, 498 U.S. 279,

291 (1991)).  In order to preserve a debtor's opportunity for a fresh start, the

nondischargeability provisions of § 523(a) should be construed liberally in favor of the

debtor.  *Id.*

**1.    Star Mountain Related Actions**

**a.    § 523(a)(2)(A)**

First, Michiko alleges Tamio and Anna made false representations in order to

induce her into investing with Star Mountain.  Section 523(a)(2)(A) bars the discharge of

a debt obtained by "false pretenses, a false representation, or actual fraud, other than a

statement respecting the debtor's or an insider's financial condition."  To establish a

claim is nondischargeable under § 523(a)(2)(A), a plaintiff must establish several

elements:

> (1) misrepresentation, fraudulent omission, or deceptive conduct by the
> debtor; (2) knowledge of the falsity or deceptiveness of his statement or
> conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on
> the debtor's statement or conduct; and (5) damage to the creditor proximately
> caused by its reliance on the debtor's statement or conduct.

MEMORANDUM OF DECISION - 9

*Martin v. Mowery (In re Mowery*), 591 B.R. 1, 6 (Bankr. D. Idaho 2018) (citing

*Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010)).

Simply the presence of a false representation or material omission by itself is not

sufficient under § 523(a)(2)(A).  "Not only must there be a representation of material fact

which is false, the representation must be made with the intention and purpose to

deceive."  *Welch v. Laraway (Laraway)*, 2010 WL 3703272, at *7 (Bankr. D. Idaho Sept.

13, 2010).  A debtor's intent to deceive may be inferred through the totality of the

circumstances.  *Huskey v. Tolman (In re Tolman)*, 491 B.R. 138, 153–54 (Bankr. D.

Idaho 2013).  Bankruptcy courts may find the requisite intent where a debtor has shown a

reckless disregard for the truth.  *Id.*

Further, there must be justifiable reliance.  "Justifiable reliance looks to the

'qualities and characteristics of the particular plaintiff, and the circumstances of the

particular case, rather than the application of a community standard of conduct to all

cases.'"  *Fetty v. DL Carlson Enters., Inc. (In re Carlson)*, 426 B.R. 840, 855 (Bankr. D.

Idaho 2010) (*quoting Field v. Mans*, 516 U.S. 59, 71 (1995)).

Michiko asserts the debt relating to her investments with Star Mountain is

nondischargeable as to both Tamio and Anna based on representations made to

Michiko.  First, Michiko alleges Tamio made representations to convince her to

sign a new promissory note with Star Mountain that did not contain personal

guarantees to replace the prior promissory note which did include such a

provision.  However, Michiko's allegations are vague without any detail as to

specific statements made by Tamio.  Further, the record establishes Michiko

MEMORANDUM OF DECISION - 10

provided Tamio the draft language for the promissory notes with little modification from Tamio.  Ex. 2017 (email from Michiko to Tamio including proposed language for promissory note).  As such, the Court is unconvinced that Tamio misled Michiko into signing promissory notes that did not contain personal guarantees, as she would have been well aware of the provisions contained in the promissory note considering she drafted it.

Additionally, Michiko asserts Anna and Tamio made several representations that her investments would be in low risk, hard money backed investments.  Michiko provided little evidence as to the occurrence or substance of the statements made by Tamio and Anna other than claiming such statements were made during their trip to Switzerland in April of 2007.  Tamio and Anna both refute making any such claim, and Tamio testified to discussing a variety of investment opportunities with Michiko.  As such, on such a sparse record, Michiko has not met her burden of establishing Tamio and Anna made any false statement to induce her into investing.

Moreover, to the extent any such statements were made, the Court is skeptical that Michiko relied on them.  Michiko testified that she would only have invested in "hard money loans" or loans backed by real estate.  However, in an email sent July 10, 2007, from Michiko to her mother, Aichu Yeh, Michiko forwarded her prior email to Tamio describing her attempts to persuade her landlord, Jane, to invest with Star Mountain.  Ex. 2038.  Michiko's email details her understanding that Star Mountain was not an SEC registered entity.  Michiko

also writes that she "wanted to get invested in to natural gas but that the minimums are higher, at a half million to get in." *Id*.

The Court recognizes that this email was sent in the months after Michiko had already signed the promissory notes with Star Mountain, and as such does not necessarily establish Michiko's knowledge and reliance at the time of the statements and signing of the notes. However, it does undermine the credibility of Michiko's assertions that she was only ever interested in investing in "hard money loans" or loans backed by real estate. Further, Michiko indicated she had performed her own personal research into the investments and talked with two lawyers about the dealings. Ex. 2038. The record also indicates Michiko was exploring and engaging in other investment opportunities outside Star Mountain, writing in an email sent June 19, 2008, about losing a portion of a separate investment. Ex. 2014. Given this, it is difficult for the Court to conclude that Michiko was uneducated and unaware as to Star Mountain's dealings being blindly led by Tamio and Anna. As such, the Court finds that, given Michiko's displayed interest in Star Mountain, her indicated outside research efforts, and her expressed interest in oil and gas investments, Michiko did not actually or justifiably rely on any alleged statement made by Tamio or Anna relating to Star Mountain's investments. Considering this evidence, the Court determines Michiko has not satisfied her burden under § 523(a)(2)(A) of establishing that Tamio and Anna made false statements to induce her into investing with Star

Mountain, or that even if they did, that Michiko actually or justifiably relied on any such statements.

### b.    § 523(a)(4)

Next, Michiko alleges Tamio and Anna embezzled funds by investing in oil and gas leases instead of hard money loans and by receiving 6% monthly interest from the Landmark Bray-Conn account while only paying Michiko and other investors 2% per month.  Under § 523(a)(4), a debt is nondischargeable to the extent it was obtained through "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

"In the nondischargeability context, embezzlement is defined as 'the fraudulent appropriation of property by a person to whom such property has been entrusted or in whose hands it has lawfully come.'"  *Murray v. Woodman (In re Woodman)*, 451 B.R. 31, 41 (Bankr. D. Idaho 2011) (quoting *Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir. 1991)).  To establish embezzlement for the purposes of nondischargeability, "a creditor must demonstrate (1) that property was rightfully in the possession of a nonowner, (2) that the nonowner appropriated the property to a use other than for which it was entrusted, and (3) the circumstances indicate fraud."  *King v. Lough (In re Lough)*, 422 B.R. 727, 735 (Bankr. D. Idaho 2010).  Circumstances indicating fraud means "such circumstances that would indicate the presence of fraud or that the debtor acted with fraudulent intent."  *Brown v. Johnson (In re Johnson)*, 2021 WL 560093, at *7 (Bankr. D. Idaho Feb. 10, 2021).

Embezzlement under § 523(a)(4) does require "'wrongful' or 'felonious' intent, similar to a 'culpable state of mind . . . involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant . . . behavior.'" *Peltier v. Van Loo Fiduciary Srvs. (In re Peltier)*, 643 B.R. 349, 363 (9th Cir. BAP 2022) (quoting *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269–74 (2013)). However, "circumstances indicating fraud" can include circumstances where the debtor intended to conceal misappropriations from the creditor. *PMM Invs., LLC v. Campbell (In re Campbell)*, 490 B.R. 390, 402 (Bankr. D. Ariz. 2013).

Here, the Court is unconvinced that the funds provided by Michiko to Star Mountain were used for a purpose other than as entrusted. While the holding account agreement Michiko and Tamio entered into specified the funds were to be used for investments with the Founders' Account, the promissory notes Michiko entered into with Star Mountain contained no such provisions and did not specify how such funds would be used. As Michiko provided the bulk of the language for the promissory note, it would appear likely Michiko was aware that under the new promissory note, there was no specified use of her funds. Further, as discussed previously, despite her testimony that she never wished to invest in oil and gas, as they were too high risk, the email sent July 10, 2007, indicated she was interested in such investments. As such, it is not apparent that Tamio and Anna, through Star Mountain, were utilizing the loan funds for an unintended purpose by investing in the Landmark Bray-Conn account.

Additionally, Michiko asserts that by only paying 2% monthly interest to Michiko and the other investors while Star Mountain was receiving 6% monthly interest, Tamio

MEMORANDUM OF DECISION - 14

and Anna were embezzling funds that should have been paid out to Michiko and others. However, the promissory notes specify that Michiko would be paid interest at a rate of 2%. Ex. 8 at 1083. Further, Michiko appears to have been aware of this fact at the time. In the email sent July 10, 2007, describing her attempts to persuade a third party to invest with Star Mountain, Michiko writes "they make more than what they pay me, but they pay me a steady return every month." Ex. 2038. As such, Tamio and Anna were not misappropriating funds intended for another purpose by paying out the interest rate designated in the promissory notes, even though Star Mountain was seeing a higher rate of return.

Michiko asserts that Tamio and Anna were required to be licensed with the Utah Division of Securities to be able to sell the promissory notes, and the fact that they were not, is a circumstance indicating fraud supporting her claim under § 523(a)(4). However, the Court was not presented with sufficient evidence to allow it to make any determination as to whether Tamio and Anna were required to be registered. Further, even if Tamio and Anna were required to be registered with the Utah Division of Securities, Michiko did not present sufficient evidence to demonstrate Tamio or Anna were aware that they were supposed to be registered or that they acted with any wrongful intent. As such, the Court finds Michiko has not caried her burden under § 523(a)(4).

### c.    § 523(a)(6)

Finally, Michiko alleges any debt owed to her by Tamio and Anna through their actions in connection with Star Mountain Enterprises is nondischargeable under § 523(a)(6). Under § 523(a)(6), a debtor is not discharged from any debt "for willful and

MEMORANDUM OF DECISION - 15

malicious injury by the debtor to another entity or to the property of another entity." As noted by the Ninth Circuit in *Lockerby v. Sierra*, "tortious conduct is a required element for a finding of nondischargeability under § 523(a)(6)." 535 F.3d 1038, 1040 (9th Cir. 2008). Thus, a mere breach of contract will not be sufficient unless accompanied by a showing of tortious conduct. *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1205 (9th Cir. 2001).

Parties must establish that the alleged injury was willful. The willfulness requirement is satisfied when "the debtor had a subjective motive to inflict the injury or that the debtor believed the injury was substantially certain to occur as a result of his conduct." *Jercich*, 238 F.3d at 1208. Importantly, under § 523(a)(6), it is not enough that the debtor performed an intentional act which resulted in the injury—the debtor must have intended the injury actually occur. *Masuo v. Galan (In re Galan)*, 455 B.R. 214, 222 (Bankr. D. Idaho 2011). Under this standard, gross recklessness is not sufficient to establish willfulness. *Plyam v. Precision Dev., LLC (In re Plyam)*, 530 B.R. 456, 464 (9th Cir. BAP 2015). Further, the debtor's actions must have been malicious. "A malicious injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." *Jercich*, 238 F.3d at 1209. "Malice may be inferred based on the nature of the wrongful act where willfulness has already been established." *Herrera v. Scott (In re Scott)*, 588 B.R. 122, 131 (Bankr. D. Idaho 2018).

Here, Michiko has not presented sufficient evidence to establish that Tamio or Anna inflicted a willful or malicious injury on Michiko. As noted above, it is not enough

MEMORANDUM OF DECISION - 16

that Tamio and Anna intentionally acted by investing in Landmark Bray-Conn without Michiko's consent, and that such action resulted in Michiko losing her funds. Rather, under § 523(a)(6), Tamio and Anna must have intended for Michiko to lose all her funds though the Landmark Bray-Conn investment for the injury to be considered willful. Considering the testimony that Tamio and Anna also invested a significant amount of their own personal funds into the account and Tamio had taken steps to try and withdraw the investment, the record does not support a finding that Tamio and Anna intended to cause Michiko's injury.[9] While the investment in a higher-risk account may have been reckless, recklessness is not sufficient to create a nondischargeable debt under § 523(a)(6). As such, Michiko has not met her burden under § 523(a)(6).

### d.    § 523(a)(19)

Michiko also alleges she is owed a debt that is nondischargeable under § 523(a)(19) in relation to Tamio and Anna's dealings through Star Mountain. Under § 523(a)(19), a debt is nondischargeable if it is for a violation of any state or federal securities law and it

> (B) results, before, on, or after the date on which the petition was filed, from—
>
>> (i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;
>>
>> (ii) any settlement agreement entered into by the debtor; or

---

[9] Further, Michiko conceded such fact in relation to Anna during her testimony, noting that she did not believe Anna was intending to inflict injury when she discussed investment opportunities.

MEMORANDUM OF DECISION - 17

(iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

Michiko asserts Tamio and Anna violated Utah state securities law through their operation of Star Mountain Enterprises. In particular, Michiko asserts Tamio and Anna are liable under Utah Code Ann. § 61-1-1 and § 61-1-22(4)(a).

At issue here is subsection (B)—whether Michiko has a judgment, order, consent order or decree entered in a federal or state judicial or administrative proceeding. In *Ellsworth v. Anderson (In re Anderson)*, 2012 WL 3133827, at *4 (Bankr. D. Idaho Aug. 1, 2012), this Court held "[o]ne of the required elements of § 523(a)(19) is that a liability determination be made in a non-bankruptcy forum 'before, on or after' the date of the filing of a debtor's petition. Such a determination must precede this Court's non-dischargeabilty determination." In making this decision, the Court considered the history of § 523(a)(19) and looked to other provisions of § 523(a) which require a judgment or order, such as § 523(a)(7), (a)(11), (a)(13), and (a)(17). In such cases where provisions of § 523(a) requires a judgment or order, the bankruptcy court does not litigate the underlying claim, but rather "merely determines the underlying claim was established in a non-bankruptcy forum and satisfies any other requirements found within § 523(a)." *Id.* at *4. While the Court recognizes there is a split of authority on this issue, the Court continues to find the reasoning set forth in *Anderson* persuasive. As such, Michiko must have a judgment or order determining Anna or Tamio's liability under Utah state securities law in order to succeed on her § 523(a)(19) claim.

MEMORANDUM OF DECISION - 18

Michiko asserts she obtained a default judgment against the entity Star Mountain

Enterprises under Utah securities law, Utah Code Ann. § 61-1-1.  Ex. 11.  Further,

Michiko asserts that default judgment declared that Anna and Tamio were jointly and

severally liable as managers of Star Mountain Enterprises pursuant to Utah Code Ann.

§ 61-1-22(4)(a).  *Id.*  However, the findings of facts from the Utah state court produced

by Michiko, Ex. 23, does not constitute a judgment or order.  Michiko also conceded she

did not have a judgment against Anna or Tamio individually in the state court action.

Additionally, Anna presented a transcript from the Utah state court indicating the state

court would be removing reference to Anna and Tamio's personal liability in the default

judgment against Star Mountain Enterprises and that a trial date would be set on the issue

of their liability.  Ex. 3000 at 113–14.  Here, the Court finds that Michiko has not met her

burden of establishing a judgment or order determining Anna and Tamio's liability under

Utah state securities law as required by § 523(a)(19)(B).

Further, to the extent any judgment was entered by the Utah state court and that

judgment established personal liability of Tamio and Anna, there is no record that the

Utah state court liquidated damages or memorialized the debt stemming from a securities

violation.  Because, under *Anderson*, the bankruptcy court does not have authority to

litigate the underlying claim, the Court finds that the Utah state court default judgment,

which did not determine damages under Utah state securities law, did not fully resolve

the claim and does not satisfy the requirement for a judgment or order under

§ 523(a)(19)(B).  As such, Michiko does not have a non-bankruptcy forum judgment

against Tamio and Anna for the violation of Utah securities law that satisfies

§ 523(a)(19)(B).[10]

### e.    Claims Involving Francine Yeh and Ken Hsieh

In her complaint, Michiko also includes assertions on behalf of Francine Yeh and

Ken Hsieh, who also invested in Star Mountain, claiming debts owed to Ms. Yeh and Mr.

Hsieh are also nondischargeable pursuant to § 523(a)(2)(A), (a)(4), and (a)(6).  While

Michiko did produce Ms. Yeh and Mr. Hsieh's promissory notes with Star Mountain and

documents showing Ms. Yeh and Mr. Hsieh assigned their rights under their respective

promissory notes to Michiko, Ex. 8 at 1085–95, she presented very limited testimony

regarding Tamio's interactions and transactions with Ms. Yeh and Mr. Hsieh, and no

evidence regarding Anna's involvement.  Further, neither Ms. Yeh nor Mr. Hsieh

testified at the trial as to the matters.  As such, on such a sparse record, the Court finds

Michiko has not met her burden as to any claim regarding Ms. Yeh and Mr. Hsieh.

### 2.    EAG Related Debt

Having determined that Michiko has not met her burden on any of the claims

relating to Tamio and Anna's actions in operating Star Mountain Enterprises, the Court

next turns to Michiko's allegations concerning EAG Investments.  Michiko alleges debts

that arose in connection with the EAG loan are nondischargeable under § 523(a)(2)(B),

(a)(4), and (a)(6) as to Tamio.  On January 4, 2010, a default judgment was entered

---

[10]  Though there were discussions as to the application of *Anderson* during pretrial litigation, the Court
never limited Michiko from presenting evidence concerning Tamio or Anna's liability under Utah
securities law, and the trial was her time to do so.  The Court finds that based on the record and legal
arguments presented, even if it had the authority to make a determination regarding the underlying
securities claim, Michiko did not carry her burden.

MEMORANDUM OF DECISION - 20

against Tamio in a Utah state court action relating to the EAG loan in the amount of

$548,408.17 along with 14% interest.  Ex. 17 at 1291–92.  As such, the Court need not

determine the amount of the debt owed to Michiko, as EAG's assignee, but rather the

nature of the debt.

<strong>a.      § 523(a)(2)(B)</strong>

First, Michiko asserts the debt is nondischargeable under § 523(a)(2)(B) because

Tamio included materially false and misleading information on the loan application.

Particularly, Michiko asserts Tamio listed on the EAG loan application that he had a

personal bank account ending in 4502 that held approximately $2.2 million, despite the

fact that the $2.2 million was held in the Landmark Bray-Conn account and the Star

Mountain bank account ending in 4502 had only $207 at the time of the loan application.

To assert a claim under § 523(a)(2)(B), Plaintiff must demonstrate by a preponderance of

the evidence:

> (1) it provided debtor with money, property, services or credit based on a written representation of fact by the debtor as to the debtor's financial condition;
> (2) the representation was materially false;
> (3) the debtor knew the representation was false when made;
> (4) the debtor made the representation with the intention of deceiving the creditor;
> (5) the creditor relied on the representation;
> (6)  the creditor's reliance was reasonable; and
> (7) damage proximately resulted from the representation.

*Maxwell v. Oregon (In re Maxwell)*, 600 B.R. 62, 69–70 (9th Cir. BAP 2019) (citing

*Grogan v. Garner*, 498 U.S. 279, 286-87 (1991)).

To be a "writing," it must have been written by the debtor, signed by the debtor, or

written by someone else but adopted and used by the debtor.  *Tallant v. Kauman (In re*

MEMORANDUM OF DECISION - 21

*Tallant)*, 218 B.R. 58, 69 (9th Cir. BAP 1996).  Additionally, that writing must concern

the debtor's financial condition. § 523(a)(2)(B).  A statement concerns the debtor's

financial condition if "it has a direct relation to or impact on the debtor's overall financial

status." *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1761 (2018).  "A

single asset has a direct relation to and impact on aggregate financial condition, so a

statement about a single asset bears on a debtor's overall financial condition and can help

indicate whether a debtor is solvent or insolvent, able to repay a given debt or not." *Id.*

Here, the writing at issue is Tamio's loan application with EAG.  Tamio asserts he

did not actually fill out the application, and that it was prepared by Elinor Hutcherson,

who he believed to be a representative of EAG.  Rosen disputes that Elinor Hutcherson

was ever an agent of EAG and was not familiar with her until the closing.  Regardless of

whether the application was fully filled out by Tamio, Tamio did sign the document.

Further, the loan application included information about Tamio's financial condition, as it

requested information about Tamio's assets and liabilities.  As such, the loan application

constitutes a writing for purposes of § 523(a)(2)(B), and that writing concerns Tamio's

financial condition.[11]

Similar to a claim under § 523(a)(2)(A), § 523(a)(2)(B) also requires a showing of

knowledge and intent.  The elements of knowledge and intent are closely intertwined and

---

[11]  The actual loan application is not a part of the evidentiary record.  However, as noted by the
bankruptcy court *Kaufman v. Tallant (In re Tallant)*, 207 B.R. 923, 924 (Bankr. E.D. Cal. 1997), nothing
in the statute or legislative history of § 523(a)(2)(B) requires the creditor to produce the writing itself to
meet their burden.  As such, while the absence of the loan document from the record makes it more
difficult to consider the representation made on the loan, its absence is not itself outcome determinative as
to Michiko's claim.

MEMORANDUM OF DECISION - 22

often analyzed together.  *See, e.g.*, *Hirth v. Donovan (In re Hirth)*, 2014 WL 7048395, at

*10 (9th Cir. BAP 2014); *Gertsch v. Johnson & Johnson (In re Gertsch)*, 237 B.R. 160,

167 (9th Cir. BAP 1999).  Knowledge can be established through either actual knowledge

of the representation's falsity, or by a reckless disregard for its truth.  *Gertsch*, 237 B.R.

at 167.  However, inexcusable negligence alone is not sufficient to satisfy this element.

*Advanta Nat'l Bank v. Kong (In re Kong)*, 239 B.R. 815, 826 (9th Cir. BAP 1999).  To

determine when "'misrepresentations cross the line from negligence to reckless

disregard,'" the Court will look to the totality of the circumstances.  *In re Tolman*, 491

B.R. at 154 (quoting *Wolf v. McGuire (In re McGuire)*, 284 B.R. 481, 492 (Bankr. D.

Colo. 2002)).

     In addition to knowledge, a plaintiff must demonstrate that the debtor acted with

the "'intention and purpose of deceiving the creditor.'"  *Gertsch*, 237 B.R. at 167

(quoting *Houtman v. Mann (In re Houtman)*, 568 F.2d 651, 656 (9th Cir. 1978)).  Like

knowledge, intent may be "inferred from the totality of the circumstances, including

reckless disregard for the truth."  *Id.* (citing *Nat'l Union Fire Ins. Co., Pa. v. Bonnanzio
(In re Bonnanzio)*, 91 F.3d 296, 301 (2d Cir. 1996)).

     Here, Michiko has not presented sufficient evidence that Tamio acted with the

actual intent of defrauding EAG when he listed the Landmark Bray-Conn account as a

personal checking or savings account on the loan application.  Michiko attempts to argue

that Tamio represented on the loan application that he had $2.2 million in a personal

account ending 4502, as well as the $2.2 million in the Landmark Bray-Conn account.

However, the testimony of Tamio and Mr. Rosen establishes that the loan application

MEMORANDUM OF DECISION - 23

only included the $2.2 million listed once on the application.  Tamio did list the $2.2

million as being in an account ending 4502 under the heading for checking and savings

accounts.  The account ending 4502 did not correspond with the Landmark Bray-Conn

account, however Tamio also included the notation "BRAE" to indicate the account was

the referenced Landmark Bray-Conn account.[12]  Further, the testimony presented

established that Mr. Rosen was aware and informed about the Landmark Bray-Conn

account, as the account served as collateral on the loan.

Michiko also has not established reliance by EAG Investments.  To establish the

element of reliance, the creditor must show that it both actually relied upon the

representation and that the reliance was reasonable.  *Field v. Mans*, 516 U.S. 59, 68

(1995) ("Section 523(a)(2)(B) expressly requires not only reasonable reliance but also

reliance in itself.").  Actual reliance occurs when, but for the representation, the creditor

likely would not have entered into the transaction.  *Heritage Pac. Fin. v. Montano (In re

Montano)*, 501 B.R. 96, 117 (9th Cir. BAP 2013).  However, the representation does not

need to be the "'sole or even the predominant or decisive factor in influencing [the

creditor's conduct]. . . . It is enough that the representation has played a substantial part,

and so has been a substantial factor, in influencing his decision.'"  *Id.* (quoting *Engalla v.

Permanente Med. Grp., Inc*., 938 P.2d 903, 919 (Cal. 1997)).  In *Pizl*, a bankruptcy court

considered the dischargeabilty of a debt under § 523(a)(2)(B) where the debtor had

included a highly inflated net worth value on a credit application.  *BBFM, Inc v. Pizl (In*

---

[12] Testimony from the parties established that the account ending 4502 was a Star Mountain Enterprises
Wells Fargo account that contained approximately $200 as of May 15, 2008.

MEMORANDUM OF DECISION - 24

*re Pizl)*, 2008 WL 4853032, at *5 (Bankr. W.D. Wash. 2008). However, because the creditor relied on the debtor's personal guaranty rather than the net worth statement in deciding to extend credit, the court found there was no actual reliance as required by § 523(a)(2)(B). *Id.*

Further, actual reliance alone is not sufficient—that reliance must also be reasonable. When determining if reliance was reasonable, the Court will look to the totality of the circumstances, including whether the creditor acted in accordance with its normal business practices. *Maxwell*, 600 B.R. at 70 (citing *Candland*, 90 F.3d at 1471); *Gertsch*, 237 B.R. at 170. A creditor does not have to perform extensive investigations into the debtor's representations prior to extending a loan. *Gertsch*, 237 B.R. at 170 (quoting *In re Figge*, 94 B.R. 654, 665 (Bankr. S. D. Cal. 1988) ("[A]lthough a creditor is not entitled to rely upon an obviously false representation of the debtor, this does not require him or her to view each representation with incredulity requiring verification."). Despite the minimal investigation necessary, however, a creditor cannot ignore warnings which would have alerted a reasonably prudent person to the debtor's representations. *Heritage Pac. Fin. v. Machuca (In re Machuca)*, 483 B.R. 726, 736 (9th Cir. BAP 2012).

Here, even if Tamio acted with the intent to defraud EAG, Michiko has not established that EAG actually or reasonably relied on his misrepresentation. Mr. Rosen testified that the "number one reason" in deciding to extend the loan was the collateral securing the loan. The Landmark Bray-Conn account served as the primary collateral, with Tamio issuing a letter of assignment in favor of EAG, allowing Landmark Bray-Conn to make disbursements to EAG. Mr. Rosen testified that EAG considered the

MEMORANDUM OF DECISION - 25

Landmark Bray-Conn account as the primary reason to extend the loan, as the purported account funds far exceeded the amount loaned by EAG.  In addition to the Landmark Bray-Conn account, real property owned by Tamio in Draper, Utah also served as collateral on the loan, as did a second position mortgage on a third party's real property. Considering Mr. Rosen's testimony and the significant collateral securing the loan, it is not apparent that EAG actually relied on any representation from Tamio concerning a personal checking or savings account.

The Court recognizes that there was testimony from Mr. Rosen that he would not have extended the loan had he known Tamio did not actually have $2.2 million in a personal banking account.  However, Mr. Rosen further testified that he only considered the amount of funds in Tamio's personal banking account in the context of assessing Tamio's credibility.  While credibility can be an important factor, the Court is not convinced EAG actually relied on Tamio's misrepresentation in deciding to extend the loan when considering Mr. Rosen's significant testimony concerning the importance of the collateral to EAG's decision-making.  Further, Mr. Rosen also testified he did not consider Tamio's personal income in making the decision to extend the loan and did not ask for such information on the loan application, and took no steps to verify that Tamio had the funds in a personal bank account.  As such, the Court is unconvinced that Tamio's misrepresentation had any significant influence on EAG's decision.  Thus, the Court finds Michiko has not met her burden of establishing EAG actually relied on Tamio's representations that he had $2.2 million in a personal bank account in deciding to extend the loan.

MEMORANDUM OF DECISION - 26

Further, any reliance was not reasonable.  Mr. Rosen was aware of the Landmark Bray-Conn account as it served as collateral on the loan and was in contact with Landmark Bray-Conn.  Yet, Mr. Rosen did not further investigate when he saw "BRAE" written on the loan application next to the account information, the listed account total was similar as the amount purported to be in the Landmark Bray-Conn account, and the Landmark Bray-Conn account was not otherwise represented on the loan application. Further, Mr. Rosen testified he never attempted to verify that Tamio had such funds in a personal banking account.  Though creditors are only required to perform minimal investigation, Mr. Rosen ignored clear warnings signs that there was something amiss with representations contained in the loan application.

Because Michiko has not presented sufficient evidence that Tamio acted with the requisite intent, or that Mr. Rosen and EAG actually or reasonably relied upon Tamio's misrepresentation, Michiko has not met her burden under § 523(a)(2)(B) and the debt will not be declared nondischargeable.

### b.    § 523(a)(6)

Finally, Michiko also asserts the amount owing to EAG is nondischargeable under § 523(a)(6) for a willful and malicious injury.  This claim was not mentioned in either Michiko's pretrial brief or closing arguments but is raised in the second amended complaint.  As such, the Court will quickly address the merits of the claim.

As discussed above, to establish a debt arose from a willful and malicious injury, Michiko must establish that Tamio engaged in tortious behavior, and intentionally caused the injury to EAG.  As discussed above, Michiko has not presented sufficient evidence to

MEMORANDUM OF DECISION - 27

establish that Tamio acted with intent to injure in including incorrect information on the EAG application.  First, Tamio testified that a third party, Elinor Hutcherson, filled out the application, while he only reviewed it and provided a signature.  Further, while the information shared was listed in the incorrect section of the loan application, the account listed did include "BRAE" next to it to signify it was the Landmark Bray-Conn account. Finally, the testimony appears to indicate Tamio informed Mr. Rosen about the Landmark Bray-Conn account, as EAG took a security interest in the account.  As such, the Court cannot conclude that Tamio acted with the intent required under § 523(a)(6).

**CONCLUSION**

The Court finds Michiko has not met her burden on any of the asserted claims, in relation to either the investments made by Star Mountain or the EAG Investments loan. As such, Michiko has not established any debts owed to her by Tamio and Anna are nondischargeable, and the Complaint will be dismissed.  The Court will enter a judgment consistent with this decision.

DATED:  September 6, 2023



_____
NOAH G. HILLEN
U.S. Bankruptcy Judge

MEMORANDUM OF DECISION - 28